## No. 13,176.

BROWN *v.* HUGHES.
(30 P. [2d] 259)

Decided February 5, 1934. Rehearing denied March 12, 1934.

Mr. HENRY H. CLARK, Mr. FRED W. STOVER, for plaintiff in error.

Mr. FANCHER SARCHET, for defendant in error.

*In Department.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

PLAINTIFF in error was one of two defendants in the trial court. For convenience, the defendant in error will be referred to as plaintiff, and the plaintiff in error as defendant.

Upon her complaint filed in the district court of Larimer county, Colorado, on the 24th of August, 1931, the plaintiff recovered a joint judgment against both defendants in the sum of $5,000, on a jury verdict. To reverse the judgment, this writ is prosecuted.

The substance of plaintiff's complaint is that the defendant, Lewis E. Brown, was a licensed dentist practicing his profession in Larimer county, Colorado; that the codefendant, Wliliam M. Desmond, was a licensed physician and surgeon practicing his profession in said county and state; that plaintiff is the widow of Clarence Hughes; that on the 21st day of April, 1931, her husband, the said Clarence Hughes, was, and for months prior thereto had been, afflicted with rheumatism, weak heart, infected teeth and infected tonsils; that on said date, the defendants, without the consent and against the will of said Clarence Hughes, administered a general anaesthetic to said Hughes and while he was under the influence thereof, removed his tonsils and extracted 16 of his upper infected teeth; that said acts were done and performed by the defendants jointly and severally. That in

the performance of said acts, defendants were negligent, careless and guilty of malpractice in removing said tonsils while Hughes was so afflicted with rheumatism, weak heart, infected teeth and infected tonsils; in extracting said teeth while so afflicted; in extracting said teeth and removing the tonsils; in administering a general anaesthetic while so afflicted; in extracting more than two or three of said teeth while so afflicted; that defendants, on account of such carelessness, negligence and malpractice caused the death of said Hughes.

The defendants filed their motion to make plaintiff's complaint more specific by setting out which one of the defendants administered the anaesthetic; which one removed his tonsils; which one extracted his teeth and stated other grounds. This motion was overruled.

In March, 1932, the defendants filed their answer in which, in substance, they deny knowledge of the physical condition of Hughes except at the time immediately prior to the operation; deny that the operation was performed without consent and against the will of Hughes; admit the performance of the operation; allege that same was properly done; that it was not unusual and was the correct and proper thing to do under the circumstances of the case; that same was skillfully done and that the patient was properly cared for after the operation, and generally denied joint or several liability.

The record discloses that there is no dispute between the parties hereto concerning the technique of the two operations that were performed while the patient was under one general anaesthetic. There is no dispute about the correctness of the diagnosis of Hughes' condition by the defendants, nor that the removal of the tonsils and the extraction of the teeth were necessary to relieve Hughes' diseased condition. The qualifications of the defendants are not questioned. The customary interest and anxiety of the defendants in the welfare of their patient is not involved. In its true sense, the only question ultimately disclosed by the entire record in the case is: Did

the defendants use bad judgment and follow improper practice and thereby negligently subject their patient to extreme danger and cause his death by performing both operations at one and the same time and more especially, the extraction of more than two or three teeth at that time?

Briefly summarized, the evidence, as to the facts, discloses that on or about April 15, Hughes, after months of suffering from a rheumatic condition, called upon Dr. McFadden of Loveland, Colorado, and was given a general examination. Dr. McFadden diagnosed his trouble as rheumatism and chronic myocarditis. The latter being an inflammation of the heart muscles caused by some local infection. He found badly infected tonsils and advised removal of same, and found the teeth in bad condition and advised an X-ray examination. Within a few days, Hughes called upon the defendant dentist for the first time and arranged for a dental examination. X-rays were taken which showed badly infected teeth and extraction was advised. The defendant dentist requested Hughes to have the services of a physician relative to the tonsil condition—Hughes did not at that time advise the defendant dentist that he had been examined by Dr. McFadden—and suggested that the other defendant, Dr. Desmond, who occupied adjoining offices, be consulted on account of convenience and his competency. Thereupon, Hughes requested a physical examination by Dr. Desmond who found the same condition as diagnosed by Dr. McFadden. Dr. Desmond advised and recommended the removal of the tonsils and teeth to eliminate the source of infection that was causing the rheumatism and heart condition, and advised that the teeth be extracted, at least some of them, while Hughes was under the general anaesthetic for the removal of the tonsils. A day or two later, Hughes, in company with his wife, appeared at the office of the dentist and physician and, according to the testimony, announced that he was ready for the operation and requested them to proceed, and that it was

with his consent that the teeth were extracted. He insisted upon having all of his teeth extracted at that time. The dentist advised against the extraction of more than 16 at that time and recommended that these be the upper teeth on account of the ease and quickness of drainage. The physician administered the anaesthetic and then requested the dentist to assist with the anaesthetic while he, the physician, removed the tonsils. After the removal of the tonsils, the physician again attended to the matter of the anaesthetic while the dentist extracted the teeth. The giving of the anaesthetic and the operation consumed about two hours after which time Hughes went to his home in the country some few miles distant. Both the physician and the dentist called at his home that evening to ascertain his condition and attend to any hemorrhages that might occur. According to their testimony, they advised the patient to go to bed and remain quiet pending recovery, but that contrary to that advice the patient was up and about the room and several days later made the trip from his home to their office for treatment. According to the testimony of plaintiff, the wife, this trip was made at the request of the physician and dentist. This is strenuously denied by defendants. The physician was in regular attendance upon Hughes whose condition gradually became worse and on the 4th of May, he died.

The defendant Dr. Desmond made the death certificate which recited the cause of death as chronic myocarditis with chronic tonsillitis and abscessed teeth as contributing causes.

This case was tried upon the theory that the removal of the tonsils and the extraction of 16 teeth were too much to have been undertaken at one time and that performing this amount of work caused the patient's death. There are many assignments of error, but those relied upon by defendant and which seem to be controlling in this case are: (1) The evidence was insufficient to justify a verdict against the defendants or either of them; (2) there is no evidence that the alleged negligent acts of

the defendants were the proximate cause of Hughes' death; (3) the court committed reversible error in the giving of its instruction No. 10, requiring the jury to return their verdict against both defendants if they found for plaintiff; (4) prejudicial statement of plaintiff's counsel in his closing argument as to one of defendant's counsel representing an "institution."

Space will not permit an extensive statement of the evidence, and we will review only such parts as are vital to the peculiar question here involved. On behalf of plaintiff, the following named witnesses testified:

Dr. Raymond, M.D., Fort Collins, Colorado. "Myocarditis makes an anaesthetic dangerous. Would not blame any doctor who had tried to remove a well defined source of infection. I consider it too much to remove more than one or two teeth at one time."

Dr. Haskell, M.D., Windsor, Colorado, after a statement of the facts made to him said, "It has been done a great many times, but that depends entirely upon the condition of the patient. With a weak or bad heart, I would say it is not good practice. I think the attending physician would be better capable of judging that than I." Asked as to his opinion as to the cause of death, he said: "Well, not having seen the patient, it would be hard for me to answer that, because there might have been other complications."

Dr. Hile, dentist, Loveland, Colorado: "It is or is not good practice in any case to extract 16 teeth at one time, depending on the condition of the patient. I wouldn't take out over two. I don't know of any general established and recognized rule of practice in any given case as to the number of teeth that should be extracted at one time. It comes back to the knowledge and judgment of the operator every time. I have read in the books where many more than 16 teeth have been extracted at one time. I have read in books or learned from other dentists of cases where all of the teeth, the 32 normal teeth, have been extracted at one and the same time."

Dr. McFadden, M.D., Loveland, Colorado: "Mr. Hughes should have had his teeth pulled. Absolutely. He should have had his tonsils out, too. There is no question about that at all. They shouldn't have all been taken out at one time, that is my stand. I don't know anything about what is good practice among dentists when they pull out teeth that are infected with pyorrhea."

Dr. Gates, dentist, Fort Collins: "I wouldn't extract more than two teeth at a time. I wouldn't say it is laid down by authorities. I don't read the text books so very much. When a person has some infected teeth and is about to undergo an operation for the removal of tonsils under a general anaesthetic—I know it is done—that is, the removal of teeth. I don't know if the practice of removing a good many infected teeth at once is still carried on considerably."

Dr. McCarty, dentist, Fort Collins: "I would not consider it good practice to extract 16 teeth at one time. I am simply stating my own idea of the best practice in extracting 16 infected teeth. I don't know what the other dentists do in Berthoud and Loveland, * * * it is just my own practice."

On behalf of the defendant, the salient parts of testimony offered follows: The two defendants testified at length concerning the details of the diagnosis, operations and post operative treatment, and related their experiences to the effect that the practice followed by them in this case was not unusual and that they considered it to generally be good practice. The defendant Brown testified: "I do not know of any textbook authority that would condemn the extraction of as many as 16 teeth from the upper jaw of a patient who was in the condition that Mr. Hughes was in the day that I saw him. Being a dentist and not a medical man, I prefer to have a medical examination. I relied absolutely on Dr. Desmond's advice on the advisability of extracting these teeth. I felt that under all the circumstances it was safe to extract

those teeth. I do not believe their extraction had anything whatever to do with the death of Mr. Hughes. His gums had healed as well as anyone could expect them to in the time that had elapsed.''

Dr. Seybold, a dental oral surgeon, Denver: ''We frequently take out 32 teeth, all the teeth in the upper and lower jaw, at one sitting. I know dentists who in a given case, if the condition of the mouth and teeth indicate the necessity of it that would go ahead and extract all 32 of the teeth at one time. I have known of a tooth extraction being done along with an appendectomy and with gall bladder operations under the same anaesthetic and in the same operation.''

Dr. Bennett, dentist, Fort Collins, Colorado: ''I do not consider under the facts stated in the hypothesis that the removal of 16 teeth from the patient from the upper jaw immediately following a tonsillectomy was dangerous or improper procedure. I have done the same myself in this city following a tonsillectomy. I did one about three weeks ago out at the county hospital.''

Dr. Setzler, dentist, Fort Collins, Colorado: ''I have many times removed as many as 16 teeth from a patient's jaw at one time. In other cases it might be better for the patient to take out all that are infected as soon as you can, and if possible at one operation.''

Dr. Lace, dentist, Denver, Colorado: ''I know of two or three cases in my own experience where a large number of teeth have been removed following a tonsillectomy, and where a patient has survived and benefited by an operation.'' This witness testified to other cases within his knowledge, where a large number of teeth had been removed at one time immediaetly following other operations.

Dr. Carey, M.D., Fort Collins, Colorado: ''I would advise the removal of teeth following the tonsillectomy, absolutely, if they are getting any infection, and while the patient was under one and the same anaesthetic.

The only test that controls me in my practice is the exercise of my best skill, care and judgment."

While the ultimate questions presented are ones of fact, and have been passed upon by the jury, the facts are to be considered in the light of the well established principles of law governing those facts. We have briefly summarized salient features of the evidence. Upon application of the law governing the liability of physicians, surgeons and dentists in like cases, we fail to find a sufficiency in the facts to justify the verdict against the defendants herein. Verdicts must be founded upon greater certainty as to liability than we believe exists in this case.

 All that the physician and dentist in this case were required to render in the way of service, in the diagnosis and treatment of their patient, was such a degree of skill and care as is ordinarily possessed by those in the practice of their profession under similar conditions of the patient and in their particular locality. Whether or not this was done can usually be determined only from the opinions of those learned in the same professions. In this case, the skill and knowledge required are in the same degree but essentially different in character. The defendants herein must first have left and entirely abandoned all knowledge acquired in the fields of exploration and adopted some rash or experimental methods before they approached the danger zone of liability. Does the evidence here evince want of skill or a reckless disregard of consequences? We think not. There is no actionable violation of a duty when only the best judgment, under the circumstances of the case, is required and used. The defendants were acting in a lawful capacity and the burden was on the plaintiff to establish negligence. The true test, as we see it, in this or like cases is: Did defendants by any act or by any omission disregard what to them was or should have been their plain duty? We believe the law of this and similar cases was correctly laid down by our court of appeals in the

case of *McGraw v. Kerr*, 23 Colo. App. 163, 167, 128 Pac. 870, in the following language:

"In the absence of a special contract otherwise providing, a physician and surgeon employed to treat an injury, impliedly contracts that he possesses that reasonable degree of learning and skill ordinarily possessed by others of his profession, and that he will use reasonable and ordinary care and diligence in the exercise of his skill and the application of his knowledge to accomplish the purpose for which he is employed, and that he will use his best judgment in the exercise of his skill in deciding upon the nature of the injury and the best mode of treatment. * * * He does not undertake to warrant a cure and is not responsible for want of success, unless that want results from failure to exercise ordinary care, or from his want of ordinary skill. * * * If he possesses ordinary skill and exercises ordinary care in applying it, he is not responsible for mistake of judgment. * * * The skilfulness of a physician in diagnosis and treatment should be tested by the recognized rules of his own school, and must be determined by resort to the testimony and opinion of experts, not only as to the correct diagnosis, but also as to whether the defendant exercised ordinary care and skill in examining the case and applying the remedies, such opinion to be based upon the facts in evidence. * * * The fact that an injured limb is defective after treatment is not evidence of negligence on the part of the physician treating it."

It is clear from the evidence in this case that Hughes sought the services of the defendants; that they possessed ordinary and reasonable learning and skill in their professions about which plaintiff raises no question and does not dispute; defendants recommended the operations and the treatment followed, to which Hughes submitted. There is evidence that the practice followed by defendants herein had been successful in similar cases in medical and dental history, and none that it had not. The general substance of the testimony of plaintiff's wit-

nesses on this question was to the effect that the particular witness did not consider it advisable practice, some saying, they would not have pulled more than two or three teeth at this time, or on the first extraction, but the majority of plaintiff's expert witnesses concluded that such matters were to be left, as in all cases, to the best judgment of the operator. True to life as we see it and live it, we venture the suggestion that it becomes easy for the professional man to say a certain course was improper when the results thereof prove to be bad, and the further suggestion in this case, that had the patient lived, and fully recovered his health, the operation herein of which complaint is made would have been pointed to with pride and leaned upon as the proper and skilful procedure under the circumstances, and no one would be heard to say that the operators used undue care and poor judgment.

Considered in this connection, many recognized experts in practically the same locality tell us, in substance, while testifying for defendants, that operations similar to those in this case and of which complaint is made are advisable under like or similar circumstances, and many times are followed with desirable results. Who could say with certainty that the defendants in this case abandoned the field of accepted practice? Having the results of the particular operations before them and their minds attuned to the sympathies of the case, it was easy for the jury to find that the improper course was followed. There must be a clearer case of total abandon than here attaches before liability occurs, otherwise, the learned judgment of our skilled profession would be lost to the human race. Without such, we could not enjoy the advancement of science.

██ As to the second argument of defendant's counsel, ''that there is no evidence that the alleged negligent acts of the defendants were the proximate cause of Hughes' death.'' The burden was on plaintiff to show that the acts of the defendants complained of were the

direct cause of death. The fact that there was a lamentable result is not of itself evidence of negligence on the part of the defendants. There is no evidence in this case, which would support a verdict, that death would not have otherwise ensued. The burden is not met by a showing that it might have resulted from the operations complained of, and jurors should not be left to conjecture as to the efficient and proximate cause. The possibility of death as a result of such operations is not sufficient. There should be evidence eliminating the intervention of other causes which might exist.

The views herein expressed terminate this case and while the other questions presented are intersting, we do not deem it necessary to discuss them.

The judgment is reversed.

MR. CHIEF JUSTICE ADAMS and MR. JUSTICE BURKE concur.