No. 15,254.

Dixon v. Norberg
(157 P. [2d] 131)

Decided March 12, 1945.

Mr. Nathan R. Kobey, Mr. Henry H. Clark, for plaintiff in error.

Mr. Joseph A. Myers, Mr. Karl C. Brauns, Mr. Grant E. McGee, for defendant in error.

*En Banc.*

Mr. Justice Jackson delivered the opinion of the court.

This is a malpractice case, tried to a jury, in which defendant in error, as the plaintiff in the trial court, obtained judgment for $7,000 against defendant who

appears here as plaintiff in error. Reference will be made to the parties as they appeared in the trial court.

That portion of the evidence which is undisputed discloses that plaintiff, while eating chop suey at an evening meal, swallowed a small pork bone which, becoming lodged in her esophagus or throat, caused such distress that she, accompanied by her husband, visited defendant's office within an hour thereafter for treatment. There defendant, after making two unsuccessful attempts to remove the bone by means of an instrument carrying a piece of surgical (long staple fiber) cotton on the end, told plaintiff he could do nothing more for her; that the case was one for a specialist who could use an esophagoscope. He thereupon called Dr. Carmody by telephone. The latter instructed defendant to take some x-rays of the pertinent area and then send the plaintiff, with the x-rays, to a hospital. This was done, and somewhat later that same evening Dr. Carmody, by means of an esophagoscope, was able first to locate and then remove the offending bone. This operation involved placing the patient under an anaesthetic and then inserting the instrument gradually down the esophagus. The basic elements of the instrument are a hollow tube within which run two wires; at the end of one of these is a small electric lamp with which the operator, by means of a reflector, can see the area just ahead of the esophagoscope; at the end of the other wire is a set of diminutive forceps with which the operator may take hold of objects. The operation itself, like other operations, is not without its dangers, but the testimony indicated that the benefits bestowed far outnumber the occasional injuries that may occur. In the instant case the operator testified that he first located some cotton on the left side of the esophagal wall, about opposite where the first rib makes a junction with the clavicle (collar bone) "and about the location that the shadow shows in the x-ray," which was exhibited to the jury; that it was the cotton that led him

to the foreign body. "I couldn't see the foreign body. I saw the cotton. The cotton was on the foreign body. I couldn't see the bone but I first saw the cotton. The bone came out with it." Subsequent examination disclosed a rent or tear in the esophagal wall. The bone or cotton, at the time of its removal, was inside, and not outside, the wall. No damage was occasioned by the use of the esophagoscope itself.

On account of this perforation in the esophagus, plaintiff became dangerously ill. Fluid developed in the pleural cavity; mixed infection—streptococcus empyema and also staphylococcus—occurred, and it was necessary to resort to liquid feeding for two weeks to prevent any solid food material working into the pleural cavity. Drainage of the latter became imperative, and the drainage tube remained in plaintiff's side for approximately three months.

Defendant testified that when plaintiff sought his services in removing the pork bone, he first examined her throat by using an illuminated tongue depressor, but was unable to detect anything in that way. He then put on his head mirror and with an electric light in back and one in front of him and holding plaintiff's tongue with a sterile pad, he thought he detected a foreign body in her throat. By means of a pair of laryngeal forceps (introduced in evidence) with a piece of surgical cotton on the end, he proceeded to try to wipe this foreign body from the throat with a sweeping motion from below, upward. Being unsuccessful, he called Dr. Carmody who instructed him to take x-rays and send the plaintiff to the hospital. He charged plaintiff ten dollars for the x-rays, making no charge for services. He stated positively that he did not insert the forceps down the esophagus of plaintiff, and that it would have been physically impossible for his forceps to have reached the spot in the esophagus where Dr. Carmody testified the pork bone was located; that he had had considerable experience in removing foreign

objects from throats of patients, although he did not claim to be a throat specialist or an esophagoscopist, but was merely a general practitioner. Dr. Siddon, a witness for defendant, testifying as a general practitioner and not as a specialist, stated that the method recounted by defendant as having been followed by him in this case was approved in the general practice of medicine. Counsel claim that defendant's testimony, being uncontradicted, should also be put in the class of undisputed testimony.

Plaintiff and her husband, however, seemed to be in doubt that the forceps introduced in evidence was actually the instrument used, their testimony being that defendant wrapped some cotton around the end of a probe, which seemed longer than the forceps, estimated to be about fourteen inches long instead of the ten inch length of the forceps exhibited by defendant, and then put it down plaintiff's throat as far as he could. "It caused a sharp pain. Then the bone in my throat slipped. I didn't have that choking. Then he took the probe out and went over and wrapped it with cotton again" and then said if he was unsuccessful he would have to resort to a specialist.

Plaintiff further testified that prior to defendant's operations there had been no hemorrhage, but that about the time she left his office, probably ten or fifteen minutes after defendant had probed, some hemorrhage occurred, although defendant testified he saw no bleeding. She indicated a point at the base of her throat, near the collar bone, where the object had lodged prior to her seeing defendant.

Exhibit FF, being the pork bone removed from plaintiff's esophagus, was identified by Dr. Carmody. This showed a piece of surgical cotton still firmly adhering to the bone. There was medical testimony to the effect that the cotton might have been swallowed by plaintiff in the operations heretofore described and, in its journey down the esophagus, have come in contact with the

bone and adhered thereto. There also was testimony to the effect that the adherence of the cotton to the bone was so firm (as already noted, sufficient to effect the removal of the bone simultaneously with that of the cotton) that the impact between the bone and the cotton must have been with more force than that involved in the act of swallowing. Although defendant testified that plaintiff complained of the foreign object being in the upper reaches of the throat, Dr. Carmody's testimony was that when defendant telephoned him about the case he stated that he had a patient in his office who had a bone in her esophagus.

Several medical specialists called by plaintiff, in answer to hypothetical questions, testified that, assuming the existence of a bone in the esophagus and a probing for it in the manner related by plaintiff, such a procedure was not good practice considering·the present standards in the profession for a general practitioner and would be dangerous to the patient.

Defendant's evidence went to the point of showing that he did not insert any instrument in plaintiff's esophagus; that the forceps which he used did not and could not reach beyond the cricoid constrictor located at the entrance to the esophagus, while plaintiff's evidence went to the point that without preliminary examination, either by way of x-ray or esophagoscope, he introduced a probe into plaintiff's esophagus causing the injury as above described.

■ Defendant's counsel, in the course of the trial and at appropriate times, moved respectively for a nonsuit, directed verdict and for a new trial. All of the motions were denied and involve the one question, whether there was sufficient competent evidence to warrant a submission of the case to the jury. We are of the opinion that there was. In *Brown v. Hughes*, 94 Colo. 295, 30 P. (2d) 259, one of the principle cases upon which defendant relies, there was no conflict in

the evidence concerning what the defendant physician did or said. In the instant case there is.

■ Counsel for defendant excepted to the giving of instruction No. 5 on the ground that it fails to state that the defendant, as a general practitioner, was not expected to have or exercise the skill of a specialist in treating cases of the kind involved in this litigation. Said instruction reads as follows: "You are instructed that in judging the proper degree of skill to be exercised by a physician or surgeon in any given case, regard is to be had to the advanced state of the profession at that time, and that a physician or surgeon by holding himself out to the world as such impliedly contracts that he possesses the reasonable degree of skill, learning and experience which good physicians and surgeons of ordinary ability and skill, practicing in similar localities, ordinarily possess, and that he will use his skill with ordinary care and diligence according to the circumstances of the case, and if you find that the defendant in this case did not use ordinary care and diligence then you will find for the plaintiff."

It would seem that this instruction is a proper one as relating to a physician in general practice, as was defendant. The standard to which he is held is "ordinary ability and skill" to be applied with "ordinary care and diligence according to the circumstances of the case." There is nothing in these words suggestive of a specialist. Counsel also objects to this instruction in that there is no statement therein that to justify a finding for plaintiff there must, in addition to a finding of lack of ordinary care and diligence on the part of defendant, also be a finding that such lack of ordinary care and diligence was the proximate cause of the injuries of which plaintiff complained. If this objection were good, then it would also apply to instruction No. 3. In our opinion both instructions are proper when read in connection with all of the other instructions, including instruction No. 10, which is the standard instruction

relating to burden of proof, and instruction No. 6, in which it is stated that a physician "does not warrant success and is not responsible for want of success unless that want results from failure to exercise that reasonable care, diligence and skill mentioned in the preceding paragraph."

We have read defendant's tendered instructions which were refused by the trial court and, in the light of the instructions given by the court, do not believe their rejection constituted prejudicial error.

Judgment affirmed.

MR. JUSTICE HILLIARD was not present at the oral argument and does not participate.