No. 16,136.

CHESNEY ET AL. *v.* THE PEOPLE.
(212 P. [2d] 1011)

Messrs. DICKERSON, MORRISSEY & ZARLENGO, for plaintiffs in error.

Mr. JOHN W. METZGER, Attorney General, Mr. JOSEPH E. NEWMAN, Deputy, Mr. RAYMOND B. DANKS, Assistant, for the people.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

THIS is a review of a conviction for conspiracy to ob-

tain money by false pretenses. The People, on November 21, 1946, filed a two-count information charging defendants in one count with a conspiracy to obtain money by means of a confidence game and in the other count, a conspiracy to obtain money by false pretenses from Elsie Marotte, and diverse other persons and from the people in general, by falsely, feloniously, designedly and knowingly pretending that X ray negatives made by them demonstrated, showed and proved that the lower internal organs of Elsie Marotte and diverse other persons were diseased or misplaced or both, and would be cured by a course of colonic irrigation treatments to be given by them, all of which representations were false, and known by the defendants to be false, when they were made and were made with the intention and for the purpose of inducing Elsie Marotte and diverse other persons to pay them money in excess of twenty dollars and thereby purposely defrauding said parties.

Standing on the plea of not guilty, defendants' trial was commenced on June 4, 1947 and concluded July 3, 1947 with verdicts of guilty as to Doctors Radcliff, Seath and Chesney and not guilty as to Dr. Martha Juanita Seath and Dr. Mabel Chesney. After denial of motion for a new trial, the defendants, Dr. R. P. Chesney, Dr. Connell F. Radcliff and Dr. R. A. Seath, were, on January 6, 1948, sentenced on the verdict, each to serve a period of not less than one year, nor more than three years in the state penitentiary.

The record of six weeks of trial is very voluminous, containing approximately 1700 pages, an over-all study of which reveals that the defendants were found guilty because, in the practice of their legitimate profession, they frequently used, and made a specialty of using, one of their major devices of treatment for which they charged all persons the same, which treatment medical doctors and osteopaths do not favor, and many question the efficacy of the chiropractic treatment, and whose

opinions are at variance with the diagnosis of the defendants herein.

It will at once be observed that in this case the field of professional diagnosis and prognosis provided a fruitful source for a difference of opinion.

■ The crime here charged is conspiracy, and since no actual agreement was shown to exist between the defendants, the conspiracy, if any, had to be shown by circumstantial evidence. The burden was upon the People to show circumstances beyond mere suspicion or conjecture, and in this case, the fact of mere relationship or association between the defendants, does not of itself show a conspiracy.

It is interesting to note on page 17 of the brief of defendant in error the following statement: "The charge here is conspiracy and not false pretenses, hence, it was not incumbent on the People to prove a case of false pretenses." In a strict sense, this statement is true, however, in the absence of direct proof as to the conspiracy, if the proof of the circumstances of false pretenses fails, the whole case is in a state of collapse.

Due to the impracticability of here relating much of the great bulk of evidence, we will hereinafter set out some of the high lights of the testimony of a few of the People's principal witnesses, including that of Elsie Marotte, the complaining witness. The same general pattern prevails in the testimony of all other witnesses without any more particular benefit or discredit to the cause of the People or the defendants, and is generally cumulative.

To properly consider the evidence herein set out, in the light of criminal procedure, it should be borne in mind that the convicted defendants were licensed practitioners of "the science of locating and removing interference with nerve transmission * * *," as defined by Colorado statute, section 2, chapter 34, '35 C.S.A., which statute further confers upon a licensee "the right to practice chiropractic as defined and to use such other

sanitary and hygienic measures necessary to such practice; * * *." And further that defendants specialized in colonic irrigation along with other chiropractic treatments.

The prosecuting witness, Elsie Marotte, testified in substance as follows: From the age of seventeen to forty-three she was ill; had had X rays of the chest because she was tubercular; also X rays of kidneys and back; had had a surgical operation for the removal of the kidney and had had a cancer of the cervix which had been burned out with radium; had been under the care of a number of medical doctors, and none of this did she disclose to the defendants at the clinic.

On October 7, 1946, in answer to an advertisement relating to a "ten-point free examination," she went to the health clinic of the defendants. Defendant Radcliff inquired about her age and her complaint. She mentioned her joints and stated that her teeth and tonsils had been removed. He took her blood pressure, stating it was a little high, and that her hemoglobin was all right. He had her stand in front of the fluoroscope and told her that her liver was all right and then told her an X ray was required. She was given an enema and the X ray taken. In about ten minutes, she went in to see the doctor whom she said was Dr. Chesney (it later developed that Dr. Chesney was out of the city during all this time) who had her X ray before him on a glass. She looked at the X ray and said, "It didn't look very clear to me, but I just looked at it." The doctor stated: "You have a lot of trouble and nobody in the world could find out what is the matter with you only by an X ray like this." And later said, "Well, it *looks like* you have a malignant mass on the side and a lot of adhesions at the bottom and ulcers and tumors up on the side, up in the top there." She asked the doctor what kind of treatment would be given and he said it would be a protracted matter and that she would have to take forty-five treatments and at the end of each treatment, an

X ray, at a total cost of $265, or, if payment was made in cash, $185. She inquired about surgery, and he said that she could have it if she wished and mentioned surgeons who could perform it. He further said, "If I took surgery I would have to be in the hospital, but by their treatment, colonic irrigations and toxin machine, they could break up the adhesions and heal the ulcers and take care of all that." She asked what guarantee he could give that she would be well if they did all that and he said, "They couldn't," and further told her that if she took the treatments and didn't get well, she could submit to surgery later. She testified that Dr. Chesney "seems to think" that they could break the adhesions loose and raise the colon by irrigations and showed her pictures of several normal colons and a picture of a colon which was normal after forty-five irrigations.

She gave the doctor no answer, saying that she would have to have her son finance the matter and would have to call her husband in Chicago. She then decided to see her family physician, W. B. Gould, a doctor of medicine and osteopathy, the following day and he made an appointment with Dr. Tedrick, who gave her a barium enema and took an X ray under fluoroscope that afternoon. After receiving Dr. Tedrick's report, she talked to her son and made a complaint to the district attorney. She later went back to the clinic with Tommy Patrick, a representative of the district attorney's office, who she introduced as "Bob." Defendant Dr. Radcliff brought in some X rays and told them that she was a pretty sick woman, but that it was not so bad that it could not be corrected by colonic irrigations. She said that he explained the picture to Mr. Patrick, saying there was a malignant mass, adhesions, ulcers and abcesses and through their method of treatment he could fix her up and she would be well. This was her statement of what the doctor said and at that point, she went out, and representatives of the district attorney's office came in.

She paid nothing for the X ray that was taken, noth-

ing for the enema, or for anything done for her; the defendants sent her no bills and they made no effort to collect for their services. She further testified that she had trouble with her hands and that there did not seem to be anybody that could find out what the trouble was. She had taken shots from Dr. Rymer, Dr. Prinzing, Dr. Cohen and Dr. W. B. Gould, none of which were of any benefit to her. She had had X rays of her thumb and of her chest, and of her kidney and back, but she did not tell the defendants at the clinic about any of this lengthy illness, neither did she tell them about having had cancer of the cervix, or a surgical operation for the removal of a kidney.

Mr. Patrick testified, in substance, that Dr. Radcliff, in showing him the X ray, stated that there was malignancy present that was serious, that there was a gaseous condition indicated in one place and an ulcerated condition in another and too sharp a turn in one location.

Agnes Davis, special investigator for the district attorney's office, testified in substance as follows: She was requested by the district attorney to make an appointment at the clinic of defendants on October 11, 1946, where she met Dr. Radcliff. Her complaint was that she was mainly tired at the time and had a tired feeling all the time. He inquired if she was troubled with gas or had colon trouble. She told him no, and he remarked that "most everyone was troubled with colon trouble and a lot of times people weren't aware of it." He then gave her a check-up by taking her blood pressure, which he said was low and accounted for some of the tired feeling; took a blood count and stated the blood was all right; examined her eyes, her lungs, and made a stethoscopic examination of the chest and heart; he stated, "I believe that your trouble is in your colon, I can't tell exactly through this machine." He then suggested an X ray of the colon and mentioned several outside doctors, Dr. Halley, Dr. Finney, Dr. Dorsey and Dr. Sugard, who were good at taking X rays. He also

stated that the clinic would take them; that he was not sure of the clinic price, but, after inquiry, returned and told her it would be $10. The witness made a deposit on the X ray picture and was told that she could pay the balance when she decided on her treatments; defendant Martha Juanita Seath gave her a barium enema and then took a picture and after the enema was expelled she dressed and talked with defendant Dr. Radcliff, who, upon showing her the X ray, told her that the difficulty was in the colon which was quite dropped and distended; that there was a little dark area in the picture which he stated showed inflammation and which would eventually ulcerate. He then informed her that if it ulcerated, it might require surgery and mentioned as possible surgeons the four men to whom reference had previously been made. She further testified that when she indicated a desire to avoid surgery, Dr. Radcliff told her that their type of treatment "probably would help, that they had helped a lot of other people by their method of treatment." He further said that the colonic irrigations washed out all of the poison in the colon and matter that was not eliminated properly.

She further testified that Dr. Radcliff was uncertain concerning the financial arrangements about the treatments and called in a lady, who she thought was Mrs. Dr. Seath, who quoted the price of $185. for a course of treatments, but fifteen treatments would be $85, which would include two X rays. On cross-examination, she testified that at the time, she was on sick leave from her employment by reason of kidney surgery performed by Dr. O. J. Smith and had been ill for about six weeks; that she had been referred to Mr. Humphreys of the district attorney's office by the attorney for the medical board, whom she had known since May of 1946. She was reimbursed for the deposit of $3.50 made on the X ray picture by the City and County of Denver; that as to her employment, she had not been paid by the Medical Society of Denver; however, she took this as-

signment from the district attorney's office although the assignment came through the medical board.

She further testified that she had had about six operations in all, some of which she mentioned to Dr. Radcliff, but said nothing about the kidney operation; she admitted that she did not give the doctor all of her symptoms; stated that she never paid the balance of the $6.50 on the X ray and never received a statement for it. She was sent by the district attorney's office to Dr. Weeks on October 21 for an X ray of her abdomen, not for the purpose of diagnosis, but to verify or disprove the picture taken at the health clinic.

C. A. Tedrick, an osteopathic radiologist, licensed to practice osteopathy, made an examination of Elsie Marotte on October 8, 1946 at the request of Dr. Gould. He testified that he made a diagnosis and formed an opinion as to the condition of Mrs. Marotte from the X rays, and among other things found that the transverse arm of the colon looped away down into the pelvis, and he could raise it but a short distance, and it was a definite conclusion that the patient had adhesions and *in his opinion* the patient had mild adhesions as a result of a former operation procedure, plus a spot on the lowest part of the colon; that his examination did not indicate that Mrs. Marotte had a malignant mass, and, *in his opinion,* she did not suffer from an ulcerated condition of a portion of the colon; that *in his opinion* the adhesions did not constitute a menace to her health; that there was a dropping or looping of the colon, and that he could not form an opinion as to the pathology or danger or disease unless he had additional information.

On cross-examination, he stated that Dr. Chesney had sent him patients and he knows something about chiropractic; that his own science of radiology is not an exact one and that he cannot always tell by reading an X ray exactly from what ailment a patient is suffering; that if a patient misrepresents about his symptoms, it complicates the reading of the X ray; that defendant Dr.

Chesney had sent to him probably five patients in the last year for X ray examination; that Dr. Chesney had equipment of his own but wanted the benefit of Dr. Tedrick's opinion in certain cases, and in most instances, those X rays were paid for by Dr. Chesney; that he had sent far more patients for laboratory examination than for X ray; that radiographs vary from day to day according to the amount of retained gas and many other little things; that he was of the *opinion* that Mrs. Marotte was not suffering from cancer of the colon or any malignant mass in the colon.

As before stated, no evidence of any kind appears in the record to show any actual agreement among the defendants to defraud. Two of them, Dr. Martha Juanita Seath and Dr. Mabel Chesney, who gave the colonic irrigations and who collected the money, were found not guilty of conspiracy. It further appears from the evidence, and is undisputed, that Dr. R. P. Chesney, one of the convicted defendants, was absent from the city from October 1 to October 15, 1946, covering the principal period here involved. By reason of this absence, nonparticipation, and an acquittal of two defendants, the alleged conspiracy chain is weakened.

Defendants in error specify twenty-one points for reversal, but particularly urge five points and confine their argument largely to the following, which are, in substance: 1. The trial court erred in refusing to direct a verdict of not guilty for the reason that circumstantial evidence only was introduced and that such evidence failed to support the charge of conspiracy in that it in no way negatived every reasonable hypothesis of innocence. 2. That the evidence adduced was as to a mere statement of opinion or prophecy and not one as to an existing fact, and was, therefore, insufficient to support the crime conspired after. 3. The court erred in allowing opinions of doctors of medicine and osteopathy with relation to the effectiveness of colonic irrigation, to set a standard of conduct for the defendants, and who testi-

fied from a medical viewpoint, the rule being that a practitioner in the healing arts is to be judged only by the recognized rules of his own school, and tested by persons having knowledge thereof. 4. The court erred in refusing testimony of a chiropractor to the effect that he had been able by colonic irrigation to raise dropped colons; in refusing testimony of persons who had actually had such experience; and the testimony of members of the general public treated by the defendants. 5. The court erred in refusing to direct a verdict of acquittal on the second count of the information, thereby subjecting defendants to double jeopardy, contrary to their constitutional rights.

Many interesting questions are developed by the record in this case, but, for reasons of brevity, we will confine our discussion largely to points 1, 2 and 3 as above set out.

■ The existence of a criminal conspiracy can easily be alleged, but direct proof thereof is seldom available; however, it may be inferred from other facts proven, which facts when so established must show the pursuance of an unlawful purpose, and in such proof, criminal and corrupt intent must be established beyond a reasonable doubt.

■ Viewed in the most favorable light for the prosecution, the evidence here does not disclose any acts of the defendants that apparently were criminal or unlawful; it does emphasize the fact that the defendants were following the prescribed and adopted standards of their profession; and that such standards have full recognition in the law of the land. The state of Colorado has licensed the defendants as chiropractors to follow and practice the tenets of their chosen school of thought. Natural sequence includes diagnosis and prognosis, and this is exactly what they were doing. The fact that the medical profession, the osteopathic profession, mental and other drugless schools of healing, do not agree with the methods of chiropractic practice, and even go to the extent

of condemning it, does not make it a crime for chiropractors to erringly diagnose and treat human ailments. If so, in all of the healing professions, no practitioner could safely venture an opinion in diagnosis without the attending fear of imprisonment.

It is to be assumed that the facts surrounding the diagnosis and prescribed treatments of Elsie Marotte, the complaining witness, provided the prime occasion for the district attorney to encircle these defendants with the strong arm of the law, and the facts disclosed by her testimony must be considered as of first importance in determining their guilt or innocence. Responding to an advertisement showing "A ten-point free examination," she voluntarily went to the health clinic of the defendants. A blood analysis was made and found satisfactory; fluoroscopic examination revealed that her heart and liver were normal; an X ray was taken of the bowels and the doctor stated, *"It looks like* you have a malignant mass on the side and a lot of adhesions at the bottom and ulcers and tumors up on the side." She inquired what kind of treatments would be given, and was told that it would be a protracted matter involving forty-five colonic irrigations and several X rays. As an alternative, the doctor suggested surgery and mentioned several surgeons who could perform the operation. She asked what guarantee he could give that she would be well " * * * and *he said they couldn't."* She testified that the doctor seemed to think they could break the adhesions loose and raise the colon by irrigations. On the next day, after receiving report from X rays taken by Dr. Tedrick, she made a complaint to the district attorney and then later went to the clinic with a representative of the district attorney's office, Tommy Patrick, and introduced him as "Bob." She also testified that the doctor told her that if she took the treatments and did not get well, she could submit to surgery later.

It is glaringly apparent there was no absolute representation made as to the efficacy of the treatment, and

no false promise of a cure. When Mrs. Marotte went to the clinic, she undoubtedly expected to get an opinion as to her ailments, which she received. She paid nothing for the X-ray examination, nothing for the enema, nothing for the blood test and the heart examination, or for any service rendered her. She relied on nothing that was told her, and lent herself to the aid of the plan for this prosecution.

The other witness, Agnes Davis, a paid informer, employed by the district attorney and sent to him by a representative of the medical profession, and which became an active factor in the attempted entrapment, testified as to the diagnosis by defendants: That she was told of four physicians who were equipped to take the X rays; she said Dr. Radcliff, one of the defendants, stated that he thought the difficulty lay in the colon and she further testified that the doctor said that their type of treatment, colonic irrigation, "probably would help, that they had helped a lot of other people by their methods of treatment and that it might not be too helpful as to a dropped colon." She paid $3.50 deposit on the X ray that was taken, never paid anything further and admitted having concealed her history as to medical treatments and operations. She obtained the diagnostic opinion and the suggested treatments and there was no coercion in connection with the acceptance of the diagnosis or treatment given her.

The testimony of these two witnesses relative to the means charged for carrying out the alleged conspiracy, as well as the testimony of numerous other witnesses of no more indictable character, was before the trial court and the insufficiency thereof specifically called to its attention by the motion for a directed verdict. There was nothing to sustain the charge in the information other than the opinions of the defendants as to a probable condition of the patients examined. The court should have recognized that an opinion cannot be proved to be false like an allegation of fact. The court also well

knew that the prosecution had alleged that the diagnosis and prophecy made by the defendants were false; that the falsity of the diagnosis and prognosis was not proven, but matters of opinion only. The motion for a directed verdict should have been sustained.

 The court was in further error in unduly limiting the defendants in the offer of evidence to show in actual cases, by witnesses on the stand, the efficacy of the treatments suggested by them which were alleged to be false and ineffective, and used for the purpose of defrauding the public. The efficacy of a medical treatment is to be determined by specific instances of its use. *Canadian-American Pharmaceutical Co. v. Coe*, 126 F. (2d) 847. The guilt or innocence of these defendants was not measured by the standards of their own profession. In this, a criminal case, there are multiple reasons why the rule announced in *Brown v. Hughes*, 94 Colo. 295, 30 P. (2d) 259, should be followed. In that case we said: " * * * All that the physician and dentist in this case were required to render in the way of service, in the diagnosis and treatment of their patient, was such a degree of skill and care as is ordinarily possessed by those in the practice of their profession under similar conditions of the patient and in their particular locality. Whether or not this was done can usually be determined *only* from the opinions of those learned in the same professions." This rule is clearly stated in *Nelson v. Dahl*, 174 Minn. 574, 219 N.W. 941.

 In the present case, there was nothing before the court to show that defendants went beyond the accepted standards of their adopted theory of practice and treatment. If in engaging in the practice of a lawful profession, they erred in their judgment, there would be no civil liability, much less criminal liability. This view was expressed by this court in the case of *Gleason v. McKeehan*, 100 Colo. 194, 66 P. (2d) 808. Moreover, there was undisputed evidence before the court that there was a standing offer by the defendants for the

refund of money paid if the patient was not satisfied with the treatment; and it was clearly shown that in all cases where requests were made, the money was refunded. It further is significant that this procedure was followed long before the prosecution was started. This one feature of the evidence alone was sufficient to indicate to the court that the charge against the defendants here was devoid of the element of intent to defraud. All of the circumstances upon which the prosecution depended to establish a conspiracy were as consistent with innocence as with guilt, and under such circumstances, no conviction can lawfully be had. 15 C.J.S., Conspiracy, p. 1150, §93.

The motion for a directed verdict made on the grounds herein indicated should have been sustained.

From our appraisal of the record before us, it is apparent that other errors were committed in the trial of this cause in the admission and rejection of evidence; failure to give certain tendered instructions; and the giving of faulty instructions; all to the prejudice of the defendants. However, it is not necessary to prolong this opinion by a discussion of such questions since the case is determined on the points reviewed.

Judgment reversed.

MR. JUSTICE STONE and MR. JUSTICE ALTER concur in the result.

MR. JUSTICE JACKSON and MR. JUSTICE HAYS dissent.