Holly H. POERTNER,
Plaintiff-Appellant,

v.

Robert L. SWEARINGEN, M.D.,
Defendant-Appellee.

No. 80–1952.

United States Court of Appeals,
Tenth Circuit.

Sept. 9, 1982.

Rehearing Denied Nov. 29, 1982.

Kenneth N. Kripke of Kripke & Epstein, Denver, Colo., for plaintiff-appellant.

Brian J. Lampert, Denver, Colo. (Roger F. Johnson, Denver, Colo., with him on the brief), for defendant-appellee.

Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Holly H. Poertner appeals the trial court's order directing a verdict in favor of the defendant, Robert L. Swearingen, M.D., in her diversity action charging Swearingen with medical malpractice—failing to diagnose properly her motorcycle accident injury. The accident caused a blood clot to form either in her neck or in her skull. Poertner contends the clot formed in her neck. If so, and if Swearingen, to whom she had gone for treatment, had ordered her hospitalized overnight for observation, the clot likely would have been detected early and Poertner could have undergone an operation that might have succeeded in removing the clot. Once the clot traveled from the neck to the skull, or if it originated in her skull, as Swearingen's experts testified, it was inoperable. The clot's presence in her skull caused Poertner paralysis and partial blindness.

Poertner claims that Swearingen's negligence cost her "a chance" to remedy the

injury.[1] The trial court found that Poertner had presented evidence of Swearingen's negligent treatment, but that her evidence of causation was insufficient because she had not satisfactorily shown that at the time of Swearingen's treatment the blood clot was in her neck. The court focused on Poertner's sole expert witness's statement on cross-examination that he could not say "with a reasonable degree of medical probability" whether the blood clot had formed in the neck or at the base of the skull. However, on direct examination he had testified that given Poertner's symptoms, he believed the clot had developed in the neck. Poertner contends that this inconsistency within the testimony of her expert witness is an issue of credibility for the jury to resolve, and therefore the trial court erred in directing a defense verdict. We agree that the trial court erred.

The key testimony by plaintiff's expert, Ward W. Woods, M.D., was as follows on *direct examination*:

"Q. Are you saying that the injury to the artery occurred not in the skull, but at the base of the neck?

A. No. I am not saying that. I think with the skull fracture—I mean, she undoubtedly had some damage there, but with the Horner's Syndrome, and the subsequent development of this paralysis, rather rapidly, makes me believe, and with my experience this is the more common thing, is that she developed a clot in the region of her internal carotid artery in her neck.

The clot formed gradually, and then finally, if you will excuse the expression,

blew off, and went up and blocked the blood supply to the ophthalmic artery of the eye, and of the major portion of the left—of the right side of the brain."
R. II, 13–14. Then on *cross-examination* the following exchange occurred.

"Q. Is that your feeling as to the mechanisms or the thing that occurred in Holly Poertner's case?

A. Again, I can't tell. She may have had development of a clot in the neck, and I say that because of the development of the Horner Syndrome. The clot then broke loose, and went up, or she may have had a clot which was produced by the local trauma at the siphon.

Q. Are you able to say which of those conditions did occur with a reasonable degree of medical probability?

A. No."
R. II, 44. On *redirect* Dr. Woods testified as follows:

"Q. ... Would the arteriograms have been different in your opinion had they been taken fifteen—twenty hours earlier, or ten hours earlier?

A. I believe so, yes.

Q. In what way would they have been different?

A. I believe that they would have shown a developing thrombosis."
R. II, 55.

The trial court, in directing the verdict, cited the record pages containing both the direct and cross-examination testimony, which he construed as an admission by the doctor that he could not say to a reasonable medical probability that the clot formed in

---

1. Poertner based her action on the "loss of chance" section of the Restatement (Second) of Torts, § 323(a) (1965):

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, ..."
Pennsylvania is the leading state in recognizing a cause of action based on "loss of chance," going so far as to hold the physician liable if his

or her negligence cost the plaintiff "any substantial possibility of avoiding injuries." *Hoeke v. Mercy Hosp.*, 299 Pa.Super. 47, 445 A.2d 140 (1982); *see Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978). The issue of whether to recognize a cause of action based on "loss of chance" has not been squarely before the Colorado courts. Swearingen urges as an alternative basis for affirmance that Colorado would not allow such a cause of action, or at least not if the chance of avoiding injuries is a "possibility" rather than a "probability". That question should first be addressed by the district court.

the neck. .Certainly the testimony on cross-examination is to that effect, but we do not think the direct testimony can be so construed. A more reasonable interpretation of the direct testimony, "No, I am not saying that," is a denial of certainty that the injury occurred in the neck. By following that denial with reference to his belief and experience and the "more common" development of the clot in the neck, the doctor was stating that it was probable the clot developed in the neck. The redirect testimony is less clear yet, but "developing thrombosis" apparently refers to the clot originating in the neck.

On this interpretation, a conflict exists between testimony of plaintiff's sole medical expert on direct (and possibly redirect) and on cross-examination. We have recently held in a criminal case, when the burden is proof beyond a reasonable doubt, that no reasonable jury could convict when a direct and unexplained conflict existed between the direct and cross-examination testimony of the government's sole witness concerning whether a conspiratorial agreement had been entered into. *United States v. Dumas*, 688 F.2d 84 (10th Cir. 1982). .But in civil cases, when the plaintiff must only prevail by a preponderance of the evidence, our past decisions have held that conflicts in the testimony of a single witness are for the jury to resolve. *See, e.g., Lohr v. Tittle*, 275 F.2d 662, 664 n.1 (10th Cir. 1960); *Olson v. Maxwell*, 263 F.2d 182, 184 (10th Cir. 1959); *see also* 30 Am.Jur.2d § 1082, p. 231 (1967) ("It is within the province of the jury to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses. [citing cases].") However, the instant case is the most extreme we have seen, inasmuch as plaintiff's sole medical witness's testimo-

ny appears contradictory and several defense experts testified the clot did not form in Poertner's neck.[2]

■ We do not have to base reversal on the ground that conflicts in plaintiff's expert's testimony are for the jury to resolve, because we also believe the jury could reasonably interpret Dr. Woods' testimony in another way. Shortly before he was asked the question on direct examination, he was admonished that his opinions must be stated "with a reasonable degree of medical probability, or reasonable degree of medical *certainty*," R. II, 11 (emphasis added). Colorado law appears to require that a doctor testify "to a reasonable medical probability."[3] However, that is not the correct standard for plaintiff's burden of proof. As in all civil actions based upon negligence, to prevail in this malpractice claim, Poertner had to prove the elements by a preponderance of the evidence, including that it was more likely than not that defendant's conduct caused her injuries.[4] *See Martin K. Eby Const. Co. v. Neely*, 344 F.2d 482, 485 (10th Cir. 1965), *aff'd*, 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967); *City of Grand Junction v. Lashmett*, 126 Colo. 256, 247 P.2d 909, 911 (1952). The two different requirements can engender confusion, as shown by a Colorado Court of Appeals case involving workers' compensation,

"The employer asserts the causal connection must be established with reasonable medical probability. This is the standard upon which a medical expert must base his opinion but it is not the standard on which the commission must make its determination. The evidence must establish the causal connection with reasonable probability, but it need not establish it with reasonable 'medical' certainty."

2. Both parties so characterize the testimony of the defense experts. The record on appeal contains only the testimony of plaintiff's medical expert.

3. This rule apparently originated in *Houser v. Eckhardt*, 168 Colo. 226, 450 P.2d 664 (Colo. 1969). There the Colorado Supreme Court held that a nontreating physician retained by the plaintiff to testify at trial "may testify to his opinion based upon reasonable medical proba-

bility as to the nature and extent of claimant's injuries and disabilities and to other related matters . . . ." 450 P.2d at 668.

4. By this we do not intend to express an opinion whether Colorado would recognize a cause of action if the "injury" was only a "lost chance" of avoiding the harm. *See* note 1 *supra*.

*Ringsby Truck Lines, Inc. v. Industrial Comm'n*, 30 Colo.App. 224, 491 P.2d 106, 107 (1971).

■ Particularly in view of the reference to reasonable medical "certainty" in the preface to Dr. Woods' testimony, we think the jury could reasonably infer he thought something more than a preponderance was required. At least in his testimony on direct examination, Dr. Woods said he believed the clot developed in the neck. Because no other portion of the cross-examination or redirect suggests he changed his mind, plausibly the witness believed "reasonable degree of medical probability" meant a standard higher than "more likely than not," and a standard he could not attest had been met.

Like any other physical fact that must be established by expert medical opinion in a negligence case, testimony concerning where the clot formed may rest upon a "medical probability," "more-likely-than-not" standard based upon the doctor's experience. Adding the words "reasonable" and "to a reasonable degree" merely confuses the issue. The jury could have reasonably inferred that the witness was confused on cross-examination and was not changing his view that the blood clot originated in the neck.

Although Swearingen's expert witnesses testified that the clot originated within the skull, resolving those opposing contentions is a matter for the fact finder. Swearingen argues as an alternative ground for affirmance that the trial judge may weigh the conflicting testimony of plaintiff's single witness against the strong contrary expert testimony defendant presented. But we do not read the trial court's opinion as being based upon such a weighing, and we too are unwilling to weigh the testimony.

REVERSED and remanded for further proceedings consistent herewith.