**Allen G. NELSON, Petitioner,**

v.

**Kipp HAMMON, D.D.S., Respondent.**

**No. 89SC171.**

Supreme Court of Colorado,
En Banc.

Dec. 10, 1990.

McDermott, Hansen, Anderson & Reilly, Daniel M. Reilly, Kirk D. Tresemer, P.C., Kirk Tresemer, Denver, for petitioner.

Stephen H. Kaplan, City Atty., City and County of Denver, Carl R. Mangino, Asst. City Atty., Denver, for respondent.

Justice KIRSHBAUM delivered the Opinion of the Court.

In *Nelson v. Hammon*, 87CA0818 (Colo. App., Feb. 2, 1989) (not selected for official publication), the Court of Appeals affirmed the trial court's order granting respondent Kipp Hammon's motion for judgment notwithstanding the verdict. Having granted petitioner Allen G. Nelson's petition for certiorari to review the judgment of the Court of Appeals, we reverse and remand with directions.

A

In May 1984, Nelson filed an amended complaint asserting that he had sustained permanent injuries to his heart and kidneys as the result of negligent diagnosis and treatment of his dental condition by Hammon and others. The evidence is undisputed that as a result of tooth extractions performed by Hammon at Denver General Hospital on January 12, 1984, bacteria entered Nelson's bloodstream, causing a condition termed bacteremia. The bacteria lodged on a defective bicuspid heart valve, resulting in the development of endocarditis, an inflammation of the lining of the heart. Nelson's alleged injuries were caused by the endocarditis.

At trial Nelson described one of his claims against Hammon as follows: "[T]hat [Hammon was] ... negligent in [his] diagnosis, care and treatment when [he] failed to diagnose the infectious process in [Nelson's] teeth, gums, and supporting structures, and when [he] failed to prescribe antibiotics to counter-act (sic) this infectious process." The parties also entered into the following two stipulations:

1. The parties stipulate that [Nelson] had a congenital bicuspid valve at the time of the dental extraction which was unknown to the defendants at the time of their treatment;

2. All defendants stipulate that the dental extractions of January 12, 1984, were the cause of the bacteremia which caused the endocarditis and its medical complications. This stipulation notwithstanding, the defendants specifically reserve the right to present evidence for the juries (sic) consideration concerning the efficacy of antibiotics in the treatment of the plaintiff and in the prevention of endocarditis.

The parties relied extensively upon the testimony of several expert witnesses to support their positions. Nelson contended that Hammon had a duty to treat his infection with antibiotics and, had that duty been observed on January 12, 1984, the endocarditis would not have developed. Hammon asserted that he had no duty to administer any antibiotics to Nelson on that date, that any duty to administer antibiotics to Nelson would have been based on an American Heart Association protocol that applies only to patients with known heart ailments, and that neither Hammon nor Nelson was aware of Nelson's defective heart valve on January 12, 1984.

At the conclusion of Nelson's case in chief and again at the close of all the evidence, Hammon moved for the entry of a directed verdict. The trial court denied these motions, and the jury subsequently returned a verdict of $100,000 in favor of Nelson and against Hammon.

Hammon filed a motion for judgment notwithstanding the verdict or, alternatively, for new trial. The trial court granted the motion for judgment notwithstanding the verdict,[1] stating in pertinent part as follows:

It is undisputed that a [prophylactic] shot of antibiotics shortly before the extraction would have prevented the infection.... The American Heart Associa-

tion has adopted a protocol [in] which antibiotics will be used prior to dental procedures only where there is a history of heart problems....

In giving his medical history to the defendant, plaintiff denied any history of heart problems....

The situation is this: Defendant did not give and should not have given antibiotics prior to the extractions. The bacterium entered the bloodstream at the time of the extractions. This last fact was stipulated to by the parties. It follows that there was no negligence on the part of the defendant....

... A major factual issue became whether the plaintiff had an infection or had an [inflammation] shortly after the extractions, and should, therefore, defendant have administered antibiotics to combat the alleged infection. As the parties stipulated that the bacterium entered the blood at the time of the extraction, it was immaterial whether plaintiff later developed an infection....

Nelson appealed the trial court's order, and the Court of Appeals affirmed. In so doing, the Court of Appeals made the following statements:

Assuming that defendant was negligent in failing to take x-rays to ascertain the extent of plaintiff's oral infection, the evidence is uncontradicted that the appropriate antibiotic dosage for treatment of the oral infection would have been insufficient to prevent plaintiff's endocarditis. Consequently, plaintiff failed to establish that the [administration] of such a dosage of antibiotics on or before January 12, 1984, would have prevented his endocarditis. Accordingly, since plaintiff's evidence taken in the light most favorable to the verdict failed to establish the requisite negligence element of causation, the trial court's entry of judgment notwithstanding the verdict was proper.

---

1. The trial court also indicated that had it denied the motion for judgment notwithstanding the verdict, it would have granted the motion for new trial on the basis of excessive damages. *See infra* Part C.

## B

Nelson alleges that both the trial court and the Court of Appeals erred in determining that the record does not contain sufficient evidence to permit a jury to conclude that he had established all the elements of his negligence claim against Hammon. We agree with Nelson's argument.

A judgment notwithstanding the verdict may be granted only if the evidence, taken in the light most favorable to the party opposing the motion and drawing every reasonable inference which may legitimately be drawn from the evidence in favor of that party, would not support a verdict by a reasonable jury in favor of the party opposing the motion. C.R.C.P. 59(e);[2] *Durango School Dist. No. 9–R v. Thorpe*, 200 Colo. 268, 273, 614 P.2d 880, 884 (1980); *see also Alzado v. Blinder, Robinson & Co.*, 752 P.2d 544 (Colo.1988); *Smith v. City and County of Denver*, 726 P.2d 1125 (Colo.1986). Conflicts in the testimony of a single witness are for the jury to resolve. *Poertner v. Swearingen*, 695 F.2d 435, 437 (10th Cir.1982). These principles must infuse the review of the evidence necessary to resolve the issues here presented.

On April 11, 1983, Nelson appeared at the Denver General Hospital Dental Clinic for assistance with respect to a broken tooth. While no treatment was rendered, X-rays revealed the presence of an infection in three of Nelson's teeth. Nelson returned to the clinic on May 5, 1983, and October 3, 1983. The infection persisted, but no· treatment was prescribed.

On January 12, 1984, Nelson returned to the clinic in considerable pain. Swelling was observable in the area of the three teeth, and the infection had spread. Nelson stated that he had no history of heart problems, and neither he nor Hammon realized that Nelson had a congenital defective bicuspid heart valve. On that date, Hammon extracted the three teeth and performed incision and drainage procedures to remove the source of the infection. Ham-

mon did not administer antibiotics to Nelson either before or after the extractions.

While much evidence at trial consisted of evaluation of several later visits by Nelson to the clinic, the controversy in this case ultimately focuses on Hammon's conduct on January 12, 1984. Certain medical facts are not disputed. It is not disputed that Nelson contracted endocarditis which was caused by an accumulation of bacteria on his defective heart valve. The parties stipulated that the presence of bacteria in Nelson's bloodstream—a condition defined as bacteremia—resulted from the dental extractions of January 12, 1984. Finally, the parties agree that the American Heart Association has promulgated a protocol recommending prophylactic administration of antibiotics to dental patients prior to any procedure when the treating dentist is aware that the patient might have a heart condition such as Nelson's. The protocol requires the oral or intravenous administration of two grams of penicillin thirty to sixty minutes prior to any surgical procedure and subsequent oral dosages of 500 milligrams of penicillin every six to eight hours for several days thereafter.

Hammon has consistently argued that he had no duty to administer antibiotics prophylactically to Nelson on ·January 12, 1984, to prevent potential endocarditis in the absence of knowledge that Nelson was susceptible to such disease. Nelson has consistently asserted that even if this argument is valid, Hammon had a duty on January 12, 1984, to administer antibiotics therapeutically to treat the serious infection present in Nelson's mouth on that date. Nelson contends that, had dosages appropriate for such therapeutic treatment been administered at that time, the endocarditis would not have developed. Thus, two critical issues at trial were whether, in view of the observable infection, Hammon had a duty to administer antibiotics and, if so, whether the dosages of antibiotics recommended for treatment of this infection would also have prevented endocarditis.

**2.** Rule 59(e) states in pertinent part as follows: "A judgment notwithstanding verdict may be granted for ... [i]nsufficiency of evidence as a matter of law...."

Dr. Daniel Burkhead, a dentist, testified as an expert witness in Nelson's behalf that in his opinion the infection in Nelson's mouth clearly had spread by January 12, 1984; that therefore antibiotics should have been administered then; and that had antibiotics been administered at that time, the infection would have been controlled. Dr. Burkhead also testified that penicillin should have been administered immediately after the incision and drainage, and that the incision and drainage procedures should have been performed prior to any extraction procedures.

On cross-examination, Dr. Burkhead testified that he would have administered one gram of penicillin initially and then "250 milligrams to 500 milligrams every six hours" thereafter for a week. Refusing to agree with the suggestion of Hammon's attorney that the initial one gram of penicillin should have been administered only after the surgical procedures had been performed, Dr. Burkhead stated that "the sooner you can get the antibiotic in the patient the more beneficial it's going to be." When cross-examined concerning a previous deposition containing statements to the effect that any antibiotics administered to Nelson could have been administered after the performance of the surgical procedures, Dr. Burkhead testified that the statements in his deposition had been based on his assumption that no antibiotics were available at the clinic when the extractions were performed. The doctor then reiterated his opinion that additional periodic doses of 250 to 500 milligrams of penicillin should have been prescribed by Hammon post-operatively on January 12, 1984.

Dr. Burkhead also testified as follows concerning the American Heart Association protocol regarding prophylactic administration of antibiotics to patients with known heart conditions:

Q And therefore if antibiotics are not given before the procedures they will not have any effect on preventing endocarditis, will they?

A Well, they will probably have an effect on it, it's just they won't be as effective.

Q They will not prevent endocarditis unless they're on board at the time of the procedures; is that correct?

A I'm not sure of that. I would say that's not necessarily—

Q You don't know?

A That's probably good, I don't know.

Q Do you disagree with the regimen of the American Heart Association?

A Absolutely not. Absolutely not.

Viewing this testimony in the light most favorable to Nelson, a reasonable jury could have concluded that on January 12, 1984, Hammon had a duty to administer one gram of penicillin to Nelson prior to performing the tooth extractions and to require Nelson to take oral dosages of 250 to 500 milligrams of penicillin every six to eight hours for one week subsequent to the surgery. The jury could also have concluded from Dr. Burkhead's testimony that the antibiotics he recommended might have prevented the development of endocarditis even if administered after the extractions.

Dr. Stephen Riley, a second dentist called as an expert witness by Hammon, testified on cross-examination that the question of whether in general antibiotics should be administered to patients prior to the performance of surgical procedures is a close question of clinical judgment and that the term prophylaxis suggests a situation in which the dentist is aware of something and seeks to prevent it. Dr. Riley opined that while antibiotics should have been administered to Nelson on January 12, 1984, to treat the obvious infection, whether they were administered before or just after the extractions was not critical. On recross-examination, Dr. Riley stated that the antibiotics he recommended were therapeutic or "post-procedure," and that he would not have recommended prophylactic antibiotic treatment before performing the procedures "because there's no heart problems or anything demonstrated here." While numerous contradictory inferences may be drawn from Dr. Riley's testimony, one such inference is that, even in the absence of any indication of heart problems, antibiot-

ics should have been administered to Nelson on January 12, 1984.

Dr. Warren D. Johnston, a cardiologist called as an expert witness by Nelson, testified on direct examination that in his opinion oral antibiotics, when administered before a patient becomes symptomatic, are effective in preventing endocarditis even after bacteria have entered the bloodstream. He also opined that the administration of oral antibiotics on January 12, 1984, would have prevented Nelson's heart infection. Although on cross-examination Dr. Johnston agreed with the presumption that to prevent endocarditis it is helpful to have antibiotics in the bloodstream before bacteria enter the blood, he also stated that it is not clear that such preliminary medication is absolutely necessary.

It is true, as Hammon argues, that Dr. Johnston also agreed on cross-examination that, accepting the parties' stipulation concerning the cause of the endocarditis,[3] Nelson's only "chance" of avoiding that condition occurred thirty minutes to one hour before his teeth were extracted on January 12, 1984. However, the jurors were properly instructed that in assessing the credibility of a witness, they could consider the consistency or inconsistency of the witness's testimony and all other relevant facts and circumstances shown by the evidence. *See* CJI–Civ.2d 3:16. Viewing Dr. Johnston's testimony in the light most favorable to Nelson and resolving any conflicts in that testimony in Nelson's favor, the jury could have viewed his testimony as establishing that administration of antibiotics even after the extractions had occurred would have prevented the development of endocarditis in this case, notwithstanding the American Heart Association protocol requiring pre-surgery administration of antibiotics to patients with known heart ailments.

Dr. Theodore C. Eickhoff, an infectious disease specialist called as an expert witness by Hammon, testified on cross-examination that a sufficient dosage of antibiotics given to a patient pre-procedurally to treat an infection could incidentally also prevent the occurrence of endocarditis. On redirect-examination of Dr. Eickhoff, the following questions and answers appear in the record:

Q  Would, in your opinion, one gram of penicillin one hour to 30 minutes before the procedure on January 12th, 1984[, have] had any effect on Mr. Nelson's ultimate course?

A  One gram probably might, might have had some effect in reducing the chance of endocarditis. Two grams, which is the recommended dose, would be better yet.

Q  Okay, so the American Heart Association recommended two grams, and that is the regimen that is presumed to be effective in preventing endocarditis.

A  That is correct.

Dr. Eickhoff's testimony supports the inference that one gram of penicillin administered thirty to sixty minutes prior to the extractions would have prevented endocarditis.

These references to the record compel the conclusion that the trial court erred in stating that Hammon "should not have given antibiotics prior to the extractions." In essence, the trial court concluded that there was no evidence that Hammon had a duty to administer antibiotics to Nelson on January 12, 1984. As above indicated, viewing the evidence most favorably to Nelson, inferences can be drawn that on that date Hammon did have a duty to administer one gram of penicillin to Nelson and to prescribe a 500 milligram oral dosage of penicillin every six to eight hours for one week thereafter. The fact that Hammon had no duty to follow the American Heart Association protocol for prophylactic treatment of patients with known heart disease does not affect that separate duty. The evidence is also sufficient to permit the inference that while the administration of such medication preferably should have occurred prior to any extractions, the recommended therapeutic dosages would have prevented endocarditis even if administered after the extractions.

---

**3.** Dr. Johnston indicated that he questioned the parties' stipulation.

The Court of Appeals did not affirm the trial court's judgment on the premise that the evidence failed to establish a duty on the part of Hammon to administer penicillin to Nelson on January 12, 1984. The Court of Appeals in essence concluded that Nelson failed to establish a causal nexus between the breach of such duty and the endocarditis because, in its view, the evidence required the conclusion that the antibiotic dosage suitable for treatment of Nelson's infection was not sufficiently potent to prevent the development of endocarditis.

Nelson's burden in this case was to establish a causal link between Hammon's failure to administer antibiotics and Nelson's subsequent development of endocarditis. In *Kaiser Found. Health Plan v. Sharp*, 741 P.2d 714 (Colo.1987), we described this burden as follows:

> The existence of a causative link between the plaintiff's injuries and the defendant's negligence is a question of fact, and it is within the province of the factfinder to determine the relationship between the defendant's negligence and the plaintiff's condition, as long as the evidence establishes "such facts and circumstances as would indicate with reasonable probability" that causation exists.... [T]he plaintiff need not prove with absolute certainty that the defendant's conduct caused the plaintiff's harm ... [h]owever, the plaintiff must establish causation beyond mere possibility or speculation.

*Id.* at 719 (quoting *City of Longmont v. Swearingen*, 81 Colo. 246, 251, 254 P. 1000, 1002 (1927)) (citations omitted).

■ Viewing the record most favorably to Nelson, the evidence permitted the jury to infer that had one gram of penicillin been administered to Nelson prior to the extractions, followed by a regimen of 250 to 500 milligrams of penicillin every six to eight hours for one week, Nelson would not have contracted endocarditis. The stipulation that the bacteria entered Nelson's system at the time of the extractions is not dispositive in view of Dr. Johnston's testimony that in his opinion antibiotics administered after bacteria had entered Nelson's blood system would have prevented the development of endocarditis.

The question is not whether the record contains evidence supporting Hammon's argument that only strict adherence to the American Heart Association protocol would have prevented the development of endocarditis in this case. The question is whether the evidence, viewed most favorably to Nelson, supports the apparent conclusions of the jury that lesser amounts of penicillin administered before or after the extractions, if administered as recommended by Dr. Burkhead, would have prevented the development of endocarditis. *Alzado v. Blinder, Robinson & Co.*, 752 P.2d 544 (Colo.1988); *Durango School Dist. No. 9-R v. Thorpe*, 200 Colo. 268, 614 P.2d 880 (1980). We answer that question affirmatively.

### C

The trial court's order also stated that "[a]bsent this dismissal, the court would have granted a new trial on all issues under the [standards] set forth in *McGraw-Hill* because of the size of the verdict." Nelson's notice of appeal described the issues to be resolved by the Court of Appeals as follows:

> A. Whether the trial court properly granted judgment notwithstanding the verdict in light of the evidence on the issue of negligence.
>
> B. Whether the trial court properly granted judgment notwithstanding the verdict in light of the evidence on the issue of damages.

In arguing the merits of the trial court's alternative judgment ordering a new trial, the briefs submitted by the parties to the Court of Appeals and to this court address the issue of whether the damage award was excessive.

■ Because of its resolution of the case on other grounds, the Court of Appeals did not resolve this issue. In view of our conclusion that the trial court's judgment notwithstanding the verdict must be reversed, the trial court's alternative ruling ordering a new trial on the basis of excessive damages remains in effect. *See Burns v.*

*McGraw–Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983). Although Nelson argues that the trial court erred in concluding that the damage award was excessive, the trial court's order granting a new trial is not an appealable order. C.R.C.P. 59(h); *Rice v. Groat,* 167 Colo. 554, 449 P.2d 355 (1969). We therefore do not address that issue.

### D

For the foregoing reasons, the judgment of the Court of Appeals is reversed. The case is remanded to that court with directions to remand it to the trial court for new trial.

ERICKSON, J., specially concurs.

VOLLACK, J., joins the special concurrence.

Justice ERICKSON specially concurring:

Following the jury verdict in favor of the plaintiff for $100,000, the defendant moved for judgment notwithstanding the verdict (J.N.O.V.). The trial court granted the motion, and the court of appeals affirmed. I write this special concurrence to specify the two-part standard for determining a motion for J.N.O.V., and to emphasize that when the trial judge determines the jury award of damages is excessive, he has the discretion to order a new trial on all issues.

### I

In reviewing a motion for J.N.O.V., the court must apply a two-pronged standard. The evidence must be viewed in the light most favorable to the verdict, and every reasonable inference which can be drawn must be made to support the verdict. *Thorpe v. Durango School Dist. No. 9–R,* 200 Colo. 268, 614 P.2d 880 (1980). J.N.O.V. may only then be granted if under these circumstances, the evidence can not support a verdict for the nonmoving party. *Id.*

In affirming the J.N.O.V., the court of appeals failed to apply the complete standard of review by not drawing every legitimate inference from the record that could be made in support of the plaintiff's verdict. In my view, a reversal is mandated because the court of appeals improperly concluded that based on the evidence presented at trial, a reasonable person could not reach the same verdict as the jury.

### II

The court order granting J.N.O.V. provided that in the alternative, the trial court would have granted a new trial on all issues, due to the size of the damages awarded by the jury. The trial court has broad discretion to order a new trial. C.R.C.P. 59(d); *Burns v. McGraw–Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983). Although the order for a new trial was apparently based on the trial court's determination that the damages were excessive, a new trial need not be limited to the issue of damages, but may properly include all other issues. *Dale v. Safeway Stores, Inc.,* 152 Colo. 581, 383 P.2d 795 (1963). An order for a new trial is not appealable, C.R.C.P. 59(h), therefore this court must return this case to the court of appeals with directions to remand to the trial court for a new trial.

VOLLACK, J., joins in this special concurrence.