# No. 17,121.

## LAMME ET AL. *v.* ORTEGA.
### (267 P. [2d] 1115)

Decided March 1, 1954.   Rehearing denied March 29, 1954.

Mr. HARRY S. SILVERSTEIN, JR., Mr. MARTIN J. HARRING-TON, for plaintiffs in error.

Mr. B. F. NAPHEYS, JR., for defendant in error.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

IN a complaint filed June 5, 1951, plaintiff Ortega alleged that defendants, as practicing physicians and surgeons, and operators of a hospital at Walsenburg, Colorado, failed to exercise ordinary skill and care, or, negligently and carelessly injured plaintiff by means unknown to him. The material parts of the complaint were denied by defendants. In a trial to a jury on December 18, 1952, plaintiff received a verdict in his favor, and judgment was entered thereon in the sum of $7,500, which judgment is the subject of this review.

Plaintiff, while handling a revolver on Saturday, January 21, 1950, was accidentally shot in one of his fingers and the upper part of his right leg. Shortly thereafter he entered the hospital of defendants James M. Lamme, Sr. and James M. Lamme, Jr. Upon admission to the hospital, he was given penicillin and other medication and put to bed, receiving no other treatment until Monday morning, when he was taken into the operating room and given a spinal anesthetic. The X-ray machine was set up, and plaintiff was placed thereunder on his left side with the X-ray tube pointed at the outside of his right leg about five inches from his body. This was in the presence of both defendants. After a brief examination, he began feeling pain and was given an anesthetic and woke up later. He then was advised that they had not removed the bullet. He was taken to the operating room again on Thursday or Friday, where the X-ray machine was used for about one-half hour, no anesthetic being given or operation performed. It appears from the testimony that in such cases it is important to consume some little time for clearing up possible secondary infection carried into the wound by a bullet. Plaintiff was taken to the operating room on the following Tuesday and his leg was "frozen" again; more pictures were taken; and he claims that the doctors were looking through the machine and asking, "Can you see it?" The

machine was about six inches from him, and in about fifteen minutes they located and removed the bullet. Following that time, defendant Lamme, Jr. saw him every day, changed bandages and administered pills; that he left the hospital on February 12; that after he had been in the hospital two weeks he told the junior doctor, "I want you to look at that place on the outside of my leg, it is burning quite a bit," [It was not where the bullet went in.] and the doctor replied, "Oh, I pulled the tape on there and that is probably what burns you." On leaving the hospital he was given a letter to his family physician, a Dr. Nyvall at Salt Lake City, where plaintiff lives. Plaintiff testified that after he got home he looked at the spot under his leg and it "was round like that (indicating), and it seemed like it was a square —just like a square—like a line, purple and four inches in diameter." The family doctor sent him to Dr. Van Sicklin, who put ointment on the place where "the blue spot was." He continued treatment with this physician once a week until May or June, when he went to the county hospital at Salt Lake City. He had cared for the wound as prescribed by the doctor and the places where the bullet went in and came out had healed. He was admitted to the hospital on July 1, 1950, and three days later was operated on and the dead tissue cut out, about four inches in diameter and from one to one and one-half inches deep. He was treated daily thereafter and later a second skin graft was performed and, "the skin finally stayed there." Plaintiff testifies there is no muscle left and it is always sore; that he is a barber; that his average earnings were $200.00 per month; that he had paid defendants $90.00; Dr. Van Sicklin at Salt Lake City, $50.00; but paid the hospital nothing, and no expense for medicine. All of this appears from his testimony.

Nine months after the time he was treated at defendants' hospital, and after the operations by the Salt Lake City physicians, a picture was taken on September 14,

1950, which was admitted in evidence over the objections of defendants' counsel. Plaintiff had taken the depositions of two Salt Lake City doctors, Drs. Clark and Robinson, which were read to the jury and in which Dr. Clark, who had treated plaintiff, testified that he did not know what actually caused the ulcer on plaintiff's leg; that he had diagnosed the condition as a decubitus ulcer (bed sore); and that from a clinical standpoint an ulcer caused by radiation burn was indistinguishable from any other ulcer. He then testified that one doctor had told another doctor who told him, that it might be a radiation burn. Dr. Clark stated, "I did not state directly that it was a radiation necrosis; I don't think any of us can ever say that. * * * I never claimed to know what caused the ulcer." In the deposition of Dr. Robinson, another witness for plaintiff, we find: "Q. You don't purport to know what the cause of this particular ulcer was? A. I do not." He then stated that it could have been due to any one of the causes of ulcer, namely, X-ray, trauma, pressure, thermal or chemical burn, contusion, or thrombosis. Both doctors testified that the ulcer could have been the result of an X-ray burn; however, it could have been the result of any one of the other many causes.

Plaintiff and his counsel seem to rely upon the claim that defendants used some form of fluoroscope, which caused a rectangular or square overexposure that later showed up and caused the condition resulting in the ulcer. A casual reading of plaintiff's testimony in describing the surroundings and what took place at the different times he was in defendants' operating room, reveals that plaintiff was not sure exactly what happened, and was uncertain as to the type of machine and how it was used in connection with the examination made of him. It is clear that some versions of his testimony with reference to the use of the machine as a fluoroscope were physically impossible, and that a fluoroscope could not be used as such in the manner described by him. He was either on the X-ray table or

bed at all times when exposures were made and he described how the two defendant doctors were stationed at his side, and, as he says, looking through the machine. It is a well-known fact that to get the results necessary from a fluoroscope, the doctor making the observation would have had to be under the table or bed if the arrangement was as plaintiff stated. It appears also from the contentions of counsel for plaintiff that an overexposure of fluoroscope would be of a square or rectangular impression. Plaintiff, in testifying, as mentioned before, stated that after he got home he looked at the spot on his leg and "it was round like that (indicating) and it seemed like it was a—just like a square—like a line, purple and four inches in diameter." Apparently, in an effort to substantiate square burn from a fluoroscope, plaintiff was in difficulty and in an instantaneous decision between what he wanted and what he did not want, he did the impossible by squaring a circle and coming up with a diameter. We then find that four and one-half months after he had left defendants' hospital he wrote a letter from Salt Lake City to defendants in which he stated, "I have been under the care of a doctor here. I have been feeling pretty sick. *I never told you anything about this matter*, but I feel that the rubber mat on the bed you issued to me was all the cause. I call it a bed sore." (Emphasis supplied.) Plaintiff testified that he called the attention of defendant Dr. Lamme, Jr., to this condition on his leg before he left the hospital, which was denied by the doctor. He then writes the above letter four and one-half months later, after two other doctors had performed two different operations on his leg. His arrangement of testimony to support his claim that he had been injured by a fluoroscope burn just does not square with the truth. So much for the highlights of the testimony. Other than to say that in reading the record with the thought of finding support for the judgment, we are unable to find substantial evidence in support thereof. Experts in the field

of radiology testified; some had examined the equipment used; and from their testimony in addition to that of defendant doctors, a fluoroscope was not used. Defendant doctors testified that a fluoroscope had not been used in their hospital for ten or twelve years, and if use of the fluoroscope had been made, the time involved in the use thereof, according to plaintiff's testimony, would have been beyond the lifetime of the bulb used in such machines. Further, the testimony fails to disclose negligence on the part of defendants or a failure on their part to exercise ordinary care or skill, and there is no certainty that plaintiff's condition, which later developed or came to light was caused by defendants, or that any act of defendants was the proximate cause of his injury. There is a total lack of positive proof or evidence that would support a finding of a causal connection between the injury and any treatment by defendant doctors. We are ready again to adhere to a former ruling of this Court in the case of *Brown v. Hughes,* 94 Colo. 295, 30 P. (2d) 259, wherein we said, "The burden is not met by a showing that it might have resulted from the operations complained of, and jurors should not be left to conjecture as to the efficient and proximate cause."

Plaintiff rested his entire case on the ground that the ulcer was the result of X-ray or fluoroscope burns received in treatments by defendants. His expert witness testified that it would take 2,000 roentgens to give a third degree burn and create an ulcer such as plaintiff has; that with the X-ray machine set as the evidence shows, about one-quarter roentgen would result for each half second exposure, and if left on for thirty minutes 1800 roentgens would result; and he further testified that the tube could not possibly last more than thirty minutes if left on. The testimony of Mr. Feldman, the radiology physicist and expert in the operation and use of X-ray machines, and Drs. Linier and Unfug was to the effect that if there was a burn on plaintiff caused by defendants, they would have had to use fluoroscope,

which both defendants said had not been in use for ten or more years, and the experts who examined the X-ray machine, which was designed so that it would be used as a fluoroscope, said they found no fluoroscope equipment in the hospital. Beside all of this, the testimony of plaintiff alone precludes the fact of the use of a fluoroscope because he repeatedly said that he was lying on his left side with the X-ray tube above him and Dr. Lamme, Jr. was standing beside the X-ray machine looking through it. This is not the technique of the use of a fluoroscope. In describing the equipment used, plaintiff was unable to give any coherent description thereof, and the only thing that he was sure about was that one of the doctors used a pair of goggles that reminded him of an aviator. Such goggles could not be mistaken for a fluoroscope screen. The testimony of defendant doctors as to what happened at the time of the operations on plaintiff and the setting of the X-ray machines and picture taking was not given wholly from memory, but was from the hospital records made at the time; and there is no testimony whatever that the settings on the machines were other than as testified to by defendant doctors.

In sum, there is not one syllable of substantial factual testimony that fixes plaintiff's condition as a result of an X-ray burn.

Finally, the evidence in the case presents no more than a questionable choice of possibilities and is not substantial; and further, there is no evidence *eliminating* the intervention of other causes which might exist, and no effort was made to offer any evidence to that effect.

For the reasons herein stated, the judgment, not being supported by competent evidence, is reversed.