**KAISER FOUNDATION HEALTH PLAN OF COLORADO; Colorado Permanente Medical Group; and Paul D. Spiedel, Petitioners,**

v.

**Gail V. SHARP and Stephen A. Sharp, Respondents.**

**No. 85SC339.**

Supreme Court of Colorado, En Banc.

July 27, 1987.

Rehearing Denied Sept. 8, 1987.

---

Cooper & Kelley, P.C., Frank R. Kennedy, Gretchen C. Rau, Denver, for petitioner Kaiser Foundation Health Plan of Colorado.

Johnson, Mahoney & Scott, P.C., Collie E. Norman, Denver, for petitioners Colorado Permanente Medical Group and Paul D. Spiedel.

McDermott, Hansen, Anderson & Reilly, William J. Hansen, Denver, John R. Olsen, P.C., Boulder, for respondents.

ERICKSON, Justice.

We granted certiorari to review the court of appeals opinion in *Sharp v. Kaiser Foundation Health Plan,* 710 P.2d 1153 (Colo.App.1985), which reversed an order of summary judgment entered in favor of the defendants on the plaintiffs' medical malpractice claim. The trial court granted summary judgment because it concluded that the plaintiffs could not prove beyond mere speculation that the defendants' negligence caused the plaintiffs' injuries. The court of appeals, in reviewing the order of summary judgment, ruled that a triable issue of fact was created by the affidavit of the plaintiffs' medical expert, which indicated that the defendants' alleged negligence substantially increased the plaintiffs' risk of injury. We affirm the court of appeals.

## I.

On April 19, 1982, Gail Sharp, a thirty-five-year-old woman suffering from obesity and hypercholesterolemia,[1] contacted Dr. Paul Speidel, an internist employed by Colorado Permanente Medical Group (Permanente), at a clinic operated by Kaiser Foundation Health Plan of Colorado (Kaiser).

---

1. Hypercholesterolemia is the presence of an abnormally large amount of cholesterol in the cells and plasma of circulating blood. *See* Stedman's Medical Dictionary 670 (24th ed. 1982).

Dr. Speidel had been treating Sharp over a period of four years for a variety of medical problems, and was aware that she suffered from hypercholesterolemia and had a significant family history of coronary artery disease. Sharp told Dr. Speidel that she was suffering from chest pains that had been increasing in intensity and frequency for two or three weeks prior to the call. Since he was concerned that her chest pains were symptoms of a serious heart problem, Dr. Speidel advised Sharp to come to the Kaiser clinic.

At the clinic, Dr. Speidel examined Sharp, and concluded that Sharp's symptoms might be indicative of a heart disorder. Dr. Speidel told her that she should be examined by a cardiologist, and prescribed sublingual nitroglycerin, to be taken when and if Sharp had any future pains, and Nadolol, a "beta blocker"[2] used for the treatment of angina.[3] He directed her to undergo further tests, including an electrocardiogram, a chest x-ray, and blood tests, which she had performed at the clinic that afternoon. Dr. Speidel also told her to call him if she had any problems or if her condition worsened.

On April 20 or 21, Sharp called the cardiologist recommended by Dr. Speidel, but was unable to get an appointment until April 29. Her condition worsened, and she allegedly attempted without success to contact Dr. Speidel three or four times between April 21 and April 23. On April 24, Sharp was admitted to the Lutheran Medical Center, and suffered an anterior myocardial infarction[4] soon thereafter.

Sharp recovered, and on November 30, 1982, she and her husband brought suit against Dr. Speidel, Kaiser, and Permanente. Sharp alleged that Dr. Speidel negligently (1) misdiagnosed her condition as stable angina, when in fact she was suffering from unstable angina, (2) failed to hospitalize her on April 19, and (3) failed to order immediate bed rest, oxygen, further diagnostic studies, long- and short-acting nitrates, and a cardiological consultation. The plaintiffs asserted that Kaiser and Permanente were vicariously liable for Dr. Speidel's acts and the acts of one another, and that both had exercised negligent hiring and training practices, which proximately caused Sharp's injuries. The complaint requested damages for Sharp's actual pecuniary loss, pain and suffering, disability, and shortened life expectancy, and for her husband's emotional distress and loss of consortium.

All of the defendants moved for summary judgment, claiming that there was no genuine issue of material fact as to whether the defendants' alleged negligence was the cause of Sharp's heart attack, and that they were entitled to judgment as a matter of law. In opposing the defendants' motions, the plaintiffs submitted an affidavit of their expert witness, Dr. Phillip Oliva, in accordance with C.R.C.P. 56(e). The affidavit stated in pertinent part:

> At the request of Mrs. Sharp's counsel, I have reviewed the circumstances surrounding her medical care and treatment in April, 1982.
>
> . . . .
>
> From a review of Mrs. Sharp's medical records, it does appear that she in fact sustained an acute myocardial infarction on the morning of April 24, 1982, shortly after being admitted to Lutheran Medical Center.
>
> Because Mrs. Sharp was not hospitalized and was not provided with appropriate treatment earlier in the week, it is impossible for me to state with any degree of certainty what her particular course and outcome would have been.

---

2. Nadolol is a nonselective beta-adrenergic receptor blocking agent designed to reduce heart rate, cardiac output, and blood pressure at rest and with exercise. *See Physicians' Desk Reference* 1739, 1741 (Medical Economics Co. 40th ed. 1986).

3. Angina is a severe constricting pain which, if originating in the chest, is usually caused by coronary disease. *See* Stedman's Medical Dictionary 73 (24th ed. 1982).

4. An anterior myocardial infarction is a sudden insufficiency of arterial or venous blood supply to the anterior wall of the heart, which produces a macroscopic area of necrosis. *See* Stedman's Medical Dictionary 706 (24th ed. 1982).

The purpose of appropriate treatment, which includes hospitalization, oxygen, bedrest, removal from a stressful environment, and the administration of long-acting nitrates and beta blockers, is to prevent further deterioration of angina and to bring about stabilization of the patient's condition, which, in turn, substantially reduces the risk of acute myocardial infarction. More often than not, this medical treatment is effective and brings about stabilization.

Those patients which do not improve and stabilize with the above medical therapy undergo cardiac catherization [sic] and possibly coronary artery bypass surgery. Acute myocardial infarctions are more often than not prevented even in this "high risk" group of patients.

It is not known what Mrs. Sharp's particular course would have been had she been treated properly. However, no matter what course her angina took, it is more probable than not that, with adequate treatment, Mrs. Sharp should not have sustained an acute myocardial infarction.

Because I cannot accurately predict the course and outcome of any particular patient under these circumstances, the best I can do is provide some statistical evidence concerning the risk of acute myocardial infarctions in patients with unstable angina in general. This is based upon my background, training and experience as a cardiologist, and my review of some of the medical literature.

It is generally accepted that, even in those patients with unstable angina who are appropriately treated with medical or surgical care, that overall, 15 percent will still sustain an acute myocardial infarction over the short term. Conversely, 85 percent of those patients treated appropriately do not sustain an acute myocardial infarction over the short term when given appropriate care and treatment.

It is difficult to generate precise numbers concerning the extent of the risk of acute myocardial infarction in those patients who are not treated appropriately by today's standards. However, review of some of the older medical studies from the 1950's and 1960's, which were done before the currently acceptable modes of treatment were available, provide some approximations of the extent of that risk factor. The risk factor appears to be approximately 35–40 percent. Conversely, approximately 60–65 percent would not have sustained an acute myocardial infarction even when the treatment was inappropriate by today's standards.

. . . .

It is therefore my opinion, to a reasonable degree of medical probability (more likely than not) that Mrs. Sharp's risk of acute myocardial infarction was substantially increased by the inappropriate care and treatment she received and that her chance of sustaining an acute myocardial infarction would have been substantially reduced had appropriate care and treatment been rendered.

The trial court granted the defense motions, and ruled that any verdict based upon evidence that hospitalizing the plaintiff would have reduced her chance of a heart attack would be too speculative to be sustained. The court concluded that in the absence of evidence that it was more likely than not that the defendants' conduct caused the plaintiff's injuries, causation could not be established.

On appeal, the court of appeals reversed the entry of summary judgment, and remanded the case for trial. The court of appeals held that causation could be established in this case upon proof that the defendants' alleged negligence was a "substantial factor" in causing the plaintiffs' injuries. 710 P.2d at 1155. A "substantial factor" was defined by the court as conduct which is of "sufficient significance in producing the harm as to lead reasonable persons to regard it as a cause and to attach responsibility." Id. The court of appeals also held that where the evidence permits a finding that the defendants' negligence increased the risk of harm to the plaintiff, the plaintiff may recover if the jury determines that the defendants' alleged negligence was a cause in fact of the loss. Id. at 1156. The court's conclusion that the plaintiff may recover for an enhancement of risk was based upon section 323(a) of the Restatement (Second) of Torts (1965), which states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if ... his failure to exercise such care increases the risk of such harm.

The court ruled that Dr. Oliva's testimony that the plaintiff's chances of suffering a heart attack were increased by twenty to twenty-five percent was sufficient evidence of causation in fact to allow a jury to consider whether the defendants' failure to treat Sharp properly was a substantial factor in causing her injuries. *Id.*

We granted certiorari, and affirm on narrower grounds. Because the plaintiffs appeal the entry of summary judgment against them, we must determine whether the defendants have proven that there is no genuine issue of material fact regarding the plaintiffs' claim that Sharp's heart attack was caused by the defendants' conduct, and that summary judgment should be granted as a matter of law. We do not consider in these proceedings, as did the court of appeals, whether the issue of causation must be submitted to the jury and may not be resolved on a motion for directed verdict, if such a motion were made in the course of a trial. We also do not address the court of appeals "substantial factor" analysis, or its application of section 323(a) of the Restatement (Second) of Torts, as the resolution of those issues is not necessary to this appeal.[5]

## II.

### A.

Summary judgment is appropriate if the pleadings, depositions, answers to interrog-

atories, and admissions, together with affidavits, if any, establish that there is no genuine issue as to a material fact, and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Bailey v. Clausen*, 192 Colo. 297, 557 P.2d 1207 (1976). When, as a matter of law and based on admitted facts, the opposing party cannot prevail, the movant is entitled to summary judgment. *O.C. Kinney, Inc. v. Paul Hardeman, Inc.*, 151 Colo. 571, 379 P.2d 628 (1963).

■ However, summary judgment is a drastic remedy, and is not a substitute for a trial of disputed facts. *Mt. Emmons Mining Co. v. Town of Crested Butte*, 690 P.2d 231 (Colo.1984); *Jones v. Dressel*, 623 P.2d 370 (Colo.1981); *Ginter v. Palmer and Co.*, 196 Colo. 203, 585 P.2d 583 (1978). Because the trial court may not assess the weight of the evidence or credibility of witnesses in determining a motion for summary judgment, the court may not grant summary judgment when there is a controverted factual issue that must be resolved in a trial. *Roderick v. City of Colorado Springs*, 193 Colo. 104, 563 P.2d 3 (1977); *Moses v. Moses*, 180 Colo. 397, 505 P.2d 1302 (1973). All doubts regarding the evidence must be resolved against the moving party, *Abrahamsen v. Mountain States Telephone and Telegraph Co.*, 177 Colo. 422, 494 P.2d 1287 (1972); *Primock v. Hamilton*, 168 Colo. 524, 452 P.2d 375 (1969), and the party against whom the motion is made is entitled to all favorable inferences that reasonably may be drawn from the evidence, *O'Herron v. State Farm Mutual Automobile Insurance Co.*, 156 Colo. 164, 397 P.2d 227 (1964).[6]

■ Even if the party opposing the motion bears the burden at trial of proving a

---

5. Although it was not necessary to its decision, the court of appeals applied the "lost-chance" doctrine embodied in Restatement (Second) of Torts § 323(a) (1965). Restatement section 323(a) has been followed in several jurisdictions, *see, e.g., Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978); *Herskovits v. Group Health Cooperative*, 99 Wash.2d 609, 664 P.2d 474 (1983), but we express no opinion on wheth-

er we would apply section 323(a) in a proper case.

6. The standard to be applied by the trial court on a motion for summary judgment is substantially similar to the standard to be applied to determine a motion for directed verdict. J. Moore, *Moore's Federal Practice* ¶ 56.15[3], at 56–479 to –480 (1987). However, there are differences between the two motions:

particular fact, the party moving for summary judgment bears the burden of proving clearly that there is no genuine issue of material fact. *O'Herron v. State Farm Mutual Automobile Insurance Co.,* 156 Colo. at 172, 397 P.2d at 231; J. Moore, *Moore's Federal Practice,* ¶ 56.15[3], at 56–463 (1987). Nevertheless, when the movant makes a convincing showing that genuine issues of fact do not exist, the opposing party is required to demonstrate by receivable facts that a real, and not formal, controversy exists. *Sullivan v. Davis,* 172 Colo. 490, 474 P.2d 218 (1970) (quoting *Bruce Construction Corp. v. United States,* 242 F.2d 873 (5th Cir.1957); *see also Salida School District R–32–J v. Morrison,* 732 P.2d 1160, 1167 n. 6 (Colo.1987).

### B.

■ To determine whether Dr. Oliva's affidavit establishes a genuine issue of fact as to the cause of the plaintiffs' injuries, the affidavit must be judged with reference to the quantum of proof necessary to establish a prima facie case of causation. To prove causation in a negligence case, the plaintiff must show by a preponderance of the evidence that the injury would not have occurred but for the defendant's negligent conduct. *Moore v. Standard Paint & Glass Co.,* 145 Colo. 151, 358 P.2d 33 (1960); *In re Swine Flu Immunization Products Liability Litigation,* 495 F.Supp. 1188, 1206 (D.Colo.1980). *See generally* CJI–Civ.2d 9:26; Restatement (Second) of

Torts §§ 431, 432 (1965). The existence of a causative link between the plaintiff's injuries and the defendant's negligence is a question of fact, *see City of Aurora v. Loveless,* 639 P.2d 1061 (Colo.1981), and it is within the province of the fact-finder to determine the relationship between the defendant's negligence and the plaintiff's condition, as long as the evidence establishes "such facts and circumstances as would indicate with reasonable probability" that causation exists. *City of Longmont v. Swearingen,* 81 Colo. 246, 251, 254 P. 1000, 1002 (1927). *See also Widefield Homes, Inc. v. Griego,* 160 Colo. 225, 416 P.2d 365 (1966); *Industrial Commission v. Royal Indemnity Co.,* 124 Colo. 210, 236 P.2d 293 (1951); *Jensen v. Linner,* 260 Minn. 22, 36–37, 108 N.W.2d 705, 714 (1961); *see generally* Annotation, *Proximate Cause in Malpractice Cases,* 13 A.L.R.2d 11, 28 (1950). To create a triable issue of fact regarding causation in a medical malpractice case, the plaintiff need not prove with absolute certainty that the defendant's conduct caused the plaintiff's harm, or establish that the defendant's negligence was the only cause of the injury suffered. J. Dooley, *Modern Tort Law* § 34.104, 34.106, at 544–45 (1983). However, the plaintiff must establish causation beyond mere possibility or speculation. *Id.* at 545; *Lamme v. Ortega,* 129 Colo. 149, 267 P.2d 1115 (1954); *Brown v. Hughes,* 94 Colo. 295, 30 P.2d 259 (1934).

[T]he motion for summary judgment may be made at an early stage of the litigation and should be made and pressed within such time as not to delay the trial, although occasionally a court has denied a motion for summary judgment without prejudice to renewal at the trial. On the other hand, a motion for directed verdict may be made at the end of plaintiff's opening statement, at the end of plaintiff's case, and by either or both parties at the close of the entire case. Hence there is a substantial time differential when these motions may be made.

The mechanics of the two motions also differ at times, as, for example, where the defendant is moving for summary judgment on the ground that plaintiff's claim lacks merit. At trial the plaintiff has the burden of, and must take the initiative in, establishing the prima facie elements of his claim; and, if he

does not, the defendant is entitled to a directed verdict. But if the defendant moves for summary judgment on the ground that plaintiff does not have an enforceable claim he has the burden of clearly establishing the lack of any triable issue of fact and must take the initiative of marshalling a record so showing. Also the movant's papers are carefully scrutinized; and those of the opposing party are on the whole indulgently regarded.

The theory underlying a motion for summary judgment is, however, substantially the same as that underlying a motion for directed verdict. The essence of both motions is that there is no genuine issue of material fact to be resolved by the trier of the facts, and that the movant is entitled to judgment on the law applicable to the established facts.

*Id.* at ¶ 56.04[2] (footnotes omitted).

In this case, the plaintiffs' expert stated in his affidavit that it was more likely than not that Sharp's risk of acute myocardial infarction was substantially increased by the allegedly inappropriate care and treatment she received, and that her chance of suffering a heart attack would have been substantially reduced if Dr. Speidel had rendered proper care. In support of his opinion, Dr. Oliva cited studies conducted before the advent of modern treatment, which tended to indicate that Sharp's risk of suffering a heart attack significantly increased as a result of the defendants' alleged negligence. Dr. Oliva stated that, more often than not, appropriate treatment, including hospitalization, oxygen, bed rest, removal from a stressful environment, and the administration of certain drugs, prevents further deterioration and stabilizes the patient's condition. In those cases in which stabilization does not occur, cardiac catheterization or artery bypass surgery more often than not prevents a myocardial infarction from occurring. Although Dr. Oliva testified, when he was deposed, that he could not say "in terms of a probability" whether hospitalization would have stabilized Sharp's condition, he stated in his affidavit that "it is more probable than not that, with adequate treatment, Mrs. Sharp should not have sustained an acute myocardial infarction" on April 24, 1982.

The defendants do not contest Dr. Oliva's affidavit, but contend that, accepting the affidavit as true, the plaintiffs cannot prove at trial to the degree of certainty required to create a triable issue of fact that their injuries were caused by the defendants' alleged negligence. The defendants have misconstrued the standard to be applied by the trial court on a motion for summary judgment. The court's consideration of a motion for summary judgment should not be based upon a prediction of potential evidence to be offered at trial, but rather on existing pleadings, depositions, answers to interrogatories, admissions, and affidavits. *See* C.R.C.P. 56(c). The plaintiffs were not required to prove their case before the trial court on a motion for summary judgment, and Dr. Oliva's affidavit demonstrates that the cause of Sharp's injuries is subject to substantial dispute. As the moving parties, the defendants bore the burden of proving that there was no genuine issue of material fact, and that they were entitled to judgment as a matter of law. Under the circumstances of this case, the defendants therefore must establish that, based on admitted facts, there is no reasonable probability that the defendants' alleged negligence caused the plaintiffs' injuries, and consequently, that there was no genuine issue of material fact regarding causation. Based on the record before it, the trial court could not conclude that the defendants have met that burden.

Accordingly, the decision of the court of appeals is affirmed, and the case is returned to the court of appeals with directions to remand the case to the trial court for further proceedings consistent with this opinion.

VOLLACK, J., does not participate.