ANTELOPE COMPANY, a Colorado limited partnership; the Anschutz Family Foundation, a Colorado nonprofit corporation; and Piedmont Minerals Company, a Colorado general partnership, Plaintiffs–Appellants and Cross–Appellees,

v.

MOBIL ROCKY MOUNTAIN, INC., a Delaware corporation, Defendant–Appellee and Cross–Appellant.

No. 99CA2366.

Colorado Court of Appeals.
Div. V.

May 24, 2001.

As Modified on Denial of Rehearing
Dec. 20, 2001.

Certiorari Denied July 22, 2002.

See also, 7 F.3d 909.

Rothgerber Johnson & Lyons, LLP, Frederick J. Baumann, Thomas M. Rogers, III, Denver, CO, for Plaintiffs–Appellants and Cross–Appellees.

Bjork, Lindley, Danielson & Baker, Peter A. Bjork, David R. Little, John P. Baker, Denver, CO, for Defendant–Appellee and Cross–Appellant.

Opinion by Judge ROTHENBERG.

Plaintiffs, Antelope Company, the Anschutz Family Foundation, and Piedmont Minerals Company (the royalty owners), appeal the trial court's entry of summary judgment. Defendant, Mobil Rocky Mountain, Inc. (Mobil), cross-appeals an order denying it the defense of collateral estoppel. We reverse and remand for further proceedings.

## I.  Background

This case is the latest in a series of lawsuits concerning the payment of royalties from sales of natural gas extracted pursuant to an oil, gas, and mineral lease (the lease). The lease pertains to a large tract of land along the Wyoming–Utah border known as the Anschutz Ranch East Unit (the Unit).

The Unit, comprised of sections of oil and gas fields, is owned and leased by separate entities. The royalty owners are lessors that possess a property interest in the natural gas produced from two sections of the Unit. As relevant here, the working interest owners are entities that possess exclusive rights to exploit the natural gas as lessees of certain sections of the Unit. Mobil is a lessee of the royalty owners and a working interest owner on part of the Unit.

All of the lawsuits, including this one, involve the interpretation of four agreements: (1) the lease, (2) the Unit Agreement, (3) the Unit Operating Agreement, and (4) a ratification agreement to the Unit Agreement entitled "Royalty Owner Joinder in and Ratification and Approval of Anschutz Ranch East Unit Agreement" (collectively, the Agreements).

In July 1982, Mobil became a lessee of one-half of sections 20 and 30 of the Unit. The Anschutz Corporation (TAC), a Kansas corporation whose principal place of business is in Colorado, had a lease interest in the other half of sections 20 and 30. Mobil and TAC also had the right to sell the natural gas it produced from sections 20 and 30 to Natural Gas Pipeline Company of America (NGPL).

The royalty owners have royalty interests in sections 20 and 30 of the Unit. These interests arise from a lease signed by the parties' predecessors in 1976. The lease binds the royalty owners and Mobil, and provides, *inter alia*, that lessees are to pay royalties to the lessors on gas "produced from the leased land and sold."

The lease permits sections 20 and 30 to be "unitized" with other sections of the Unit to maximize recovery of the gas reserves, and in December 1982, Mobil and the other working interest owners agreed to unitization.

Through unitization, or pooling of the fields, the working interest owners in the various sections of the Unit agree jointly to recover the oil and gas in the Unit without regard to their separate ownerships. The purpose of unitization is to prevent waste and maximize recovery by allocating more economically the costs and benefits under the working interest owners' agreement.

Also, pursuant to the lease, Mobil entered into a Unit Agreement and a Unit Operating Agreement with the other working interest owners. Under the Unit Agreement, "Allocable Unitized Substances" are defined as almost all produced oil, gas, and associated hydrocarbons, except for "Injected Unitized Substances." Injected Unitized Substances are substances injected back into the producing formation to maintain reservoir pressure, repressure the reservoir, cycle or recycle production, enhance production, or increase later production.

Allocable Unitized Substances (including gas) produced from the Unit are allocated among the tracts of land within the Unit according to the tracts' respective "hydrocarbon pore volume." Section 1.1.2 of the Unit Agreement provides that the point at which the Allocable Unitized Substances are identified and measured for purposes of allocating them among the tracts is "where such Allocable Unitized Substances are available for delivery to the respective owners thereof."

Section 10.8.1 of the Unit Agreement provides that once allocated among the "allocation tracts" in the Unit, all Allocable Unitized Substances are:

owned by the owner or owners of the Working Interest in such Allocation Tract and each owner shall take in kind or separately dispose of its share of Allocable Unitized Substances, subject to the provisions of Section 13.1 hereof and *in accordance with Article 5 of the Unit Operating Agreement.* (emphasis added)

As pertinent here, § 5.11 of the Unit Operating Agreement provides that:

Inability to Market All Gas. If at any time a Party's share of the gas available for sale exceeds the quantity of gas such Party's gas purchaser will take (excess gas), then

every other Party, if requested to do so by the Party owning such excess gas, shall be obligated to share its market for gas with the Party owning such excess. However, if all excess gas cannot be sold, and the Plan of Depletion then in effect will not permit a reduction in the volume of gas produced, then any of such excess gas that must be reinjected or otherwise disposed of will be deemed to be the gas of all Parties such that all Parties will share ratably (in proportion to their ownership of the total volume of gas available for sale) in any deferral of sales or loss which might result from the reinjection or disposal of such excess gas sold on a monthly basis.

In November 1982, a representative of the royalty owners signed a Ratification Agreement to the Unit Agreement. The Ratification Agreement states that the royalty owners received "full and true copies of the Anschutz Ranch East Unit Agreement and the Anschutz Ranch East Unit Operating Agreement."

The royalty owners admit they ratified the Unit Agreement, but deny they are parties to the Unit Operating Agreement.

The 1982 Ratification Agreement does not expressly adopt the Unit Operating Agreement. However, ratification is unnecessary under the express terms of § 7 of the lease which provides that:

*Lessee also shall have the right to unitize,* pool, or combine all or any part of the above described lands with other lands in the same general area *by entering into a cooperative or unit plan of development or operation* approved by any governmental authority.... In such event, the terms, conditions, and provisions of this lease *shall be deemed modified to conform to the terms, conditions, and provisions of such approved cooperative or unit plan of development or operation.* ... (emphasis added)

### A. The Wyoming Litigation

From 1985–87, Mobil and TAC sold gas from the Unit to NGPL. When a dispute arose over the proper allocation of the proceeds, the working interest owners other than Mobil filed an action against TAC in the federal district court in Wyoming. The com-

plaint alleged claims for breach of contract and sought an accounting and a determination of the working interest owners' share of the proceeds. *See Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909 (10th Cir.1993).

More specifically, the working interest owners alleged that § 5.11 of the Unit Operating Agreement required TAC to pay all of the working interest owners, except Mobil, a portion of the revenues TAC had received from NGPL for the sale of gas from the Unit.

The royalty owners were not parties to that lawsuit. The working interest owners also did not name Mobil in the lawsuit, but TAC joined Mobil and others as third-party defendants.

In its defense, TAC maintained that § 5.11 of the Unit Operating Agreement was not operative because the working interest owners did not have the prerequisite gas purchasers, did not make the required request that TAC sell the working class owners' share of the gas produced, and because TAC never sold any more than its own working interest share of the gas available.

Before trial, Mobil settled with the working interest owners except TAC, but Mobil remained in the lawsuit as a third-party defendant.

The Unit Agreement provided that Colorado law would govern, and the Wyoming federal district court—citing Colorado law—concluded that the term "excess gas" used in § 5.11 of the Unit Operating Agreement was ambiguous. The court reasoned that excess gas could mean either the quantity left after a purchaser has taken some gas, or any quantity of gas unsold. *See Amoco Rocmount Co. v. Anschutz Corp., supra* (fn.5). Hence, it was unclear whether that section of the Unit Operating Agreement required each working interest owner to have an actual gas purchaser as a prerequisite to the allocation scheme set out in the rest of § 5.11.

After concluding § 5.11 was ambiguous, the Wyoming federal district court received extensive extrinsic evidence to determine the mutual intent of the parties at the time of the contract. The court construed the Agreements to mean that: (1) § 5.11 did *not* re-quire that all the working interest owners have an actual gas purchaser as a prerequisite to the allocation scheme set out in § 5.11; (2) the intent of the parties was to share *pro rata* in any gas market available; and (3) therefore, TAC was required to share the proceeds of its sales to NGPL with the other working interest owners. The Wyoming federal district court's judgment construing § 5.11 adversely to TAC was affirmed on appeal. *Amoco Rocmount Co. v. Anschutz Corp., supra* (affirming all issues except prejudgment interest).

### B. Current Litigation

In 1994, the royalty owners filed this action to recover royalties allegedly due from Mobil's gas sales to NGPL. A dispositive issue in the current litigation is whether Mobil owned all of the gas that it sold to NGPL. If it did, Mobil would owe millions of dollars in royalties on that gas. However, if the gas that Mobil sold to NGPL was jointly owned by the other working interest owners—as Mobil contends—Mobil only would owe royalties on a fraction of the total gas sold, and it is undisputed that such lesser amount already has been paid.

The royalty owners claimed that under the lease and the Unit Agreement, they were entitled to royalties on any production allocated to Mobil, which in this case is *all* the gas that Mobil sold to NGPL. According to the royalty owners:

> Mobil's entire interest in the Unit, which was approximately 20 percent, derived from the Royalty Owners' tracts.

> In summary, under the Unit Agreement, the total volume of gas produced from the Unit and made available for delivery to [working interest owners] like Mobil is allocated to the tracts of land within the Unit according to their hydrocarbon pore volume. Each [working interest owner], including Mobil, is responsible for paying royalties on any such gas sold. The amount of such royalties depends on the [working interest owner's] particular lease.

Mobil disagreed, contending that sixty percent of the gas it sold was owned by other working interest owners under the Unit

Agreement. Under Mobil's method of allocation, the royalty owners were owed royalties only on forty percent of the gas sold, and because TAC holds a half interest, Mobil only owed royalties on twenty percent of the gas sold to NGPL. Because it is undisputed that Mobil already paid that amount, Mobil sought judgment in its favor.

### C. First Summary Judgment and Appeal

In December 1996, the trial court entered summary judgment in favor of Mobil, concluding that the resolution of the Wyoming litigation barred the royalty owners' state court action under the doctrine of collateral estoppel.

The royalty owners appealed, and a division of this court reversed the summary judgment. The panel held that at least one of the elements of collateral estoppel was unsatisfied because there was a genuine issue of material fact whether the royalty owners were in privity with TAC, one of the defendants in the Wyoming litigation. *Antelope Co. v. Mobil Rocky Mountain, Inc.,* (Colo.App. No. 97CA0043, Dec. 26, 1997)(not selected for official publication)(*Antelope* I). The panel remanded for further proceedings on the collateral estoppel issue.

### D. Remand and Second Summary Judgment

On remand, the parties prepared for a jury trial. None of the parties filed a motion for summary judgment. However, approximately one week before the trial date, Mobil filed a motion *in limine* to exclude the introduction of parol evidence, asserting that:

> the contractual provisions which govern the payment of royalties from [Mobil] to [the royalty owners] are clear and unambiguous—a finding previously determined by [the trial court].

Mobil thus sought a ruling that, because the trial court had previously ruled that the relevant agreements were unambiguous as a matter of law, parol evidence pertaining to the Wyoming litigation was inadmissible for purposes of contract interpretation or determination of the parties' intent.

On the morning of trial, the trial court—a different judge presiding—addressed Mobil's motion *in limine*. The royalty owners took the position that whether parol evidence was admissible first required the trial court to determine whether collateral estoppel applied with respect to the Wyoming litigation. The court agreed, and proceeded to hear initial arguments from the parties as to whether the collateral estoppel issue was proper for the court to decide, or whether—as Mobil asserted—it was a jury question.

After concluding it had the authority to decide the collateral estoppel issue, the trial court heard arguments addressing whether collateral estoppel should be applied against the royalty owners. Although the court engaged in a lengthy colloquy with counsel, no testimony was taken and it is unclear whether the court considered the exhibits that had been tendered without objection for the anticipated jury trial.

In an oral ruling following counsel's arguments, the trial court responded to the collateral estoppel issue addressed by the panel in *Antelope I* by ruling that collateral estoppel did not apply. It determined that the interests of TAC, a defendant in the Wyoming litigation, and the interests of the royalty owners, who are plaintiffs here, were not the same. Hence, the trial court found as a matter of law that there was no privity between them and that Mobil was not entitled to assert collateral estoppel or issue preclusion as to the royalty owners.

The trial court went on to hear arguments regarding the ambiguity of the Agreements. Following these arguments, the court expressed its disagreement with the Wyoming federal district court's ruling that the Agreements were ambiguous, and instead ruled that: (1) while the contracts were "highly complex," they were not ambiguous; (2) the gas Mobil sold to NGPL was jointly owned by the other working interest owners; (3) the Agreements unambiguously supported Mobil's position that it only owned a fraction of the gas it sold to NGPL and therefore only owed royalties on a fraction of the total gas sold; and (4) the full amount owed had already been paid.

The trial court did not rule on Mobil's motion *in limine*. It stated *sua sponte* that it was treating the motion "as essentially a renewal of the motion for summary judgment," and then entered summary judgment in favor of Mobil. The royalty owners now appeal from that ruling.

## II. Prior Division's Failure to Rule

Initially, we reject the royalty owners' contention that the trial court erred in granting summary judgment because a division of this court previously declined to rule that the Agreements were unambiguous.

Our review of an order granting a motion for summary judgment is *de novo*. *Aspen Wilderness Workshop, Inc. v. Colorado Water Conservation Board*, 901 P.2d 1251 (Colo. 1995).

Summary judgment is a drastic remedy and should be granted only upon a clear showing that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Compass Insurance Co. v. City of Littleton*, 984 P.2d 606 (Colo.1999).

All doubts as to the existence of a genuine issue of material fact are resolved in favor of the nonmoving party. *Kaiser Foundation Health Plan v. Sharp*, 741 P.2d 714 (Colo. 1987). Summary judgment may not be granted when the pleadings and affidavits submitted to the trial court show there are material facts in dispute. *McCormick v. Diamond Shamrock Corp.*, 175 Colo. 406, 487 P.2d 1333 (1971).

■ Here, the trial court's 1996 ruling that the royalty owners were collaterally estopped from suing Mobil was reversed in the prior appeal. *Antelope I*. However, the ambiguity of the Agreements was not the basis of the trial court's 1996 judgment, and resolution of that issue was unnecessary to the disposition of the prior appeal. *See Smeal v. Oldenettel*, 814 P.2d 904 (Colo.1991)(appellate courts should avoid addressing issues that are unnecessary to disposition of the appeal).

In fact, the prior division clarified that:

Although we recognize that the trial court does make reference in its written order to the issue of contract interpretation, in our view, such reference was in the context of its discussion of the issue of collateral estoppel.

*Antelope I, supra* (slip op. at 3).

Accordingly, because the division in *Antelope I* reversed the trial court while addressing the issue of collateral estoppel, its failure to address whether the Agreements were unambiguous has no bearing on the issues now before us.

## III. Second Summary Judgment

Nevertheless, we do agree with the royalty owners' contention that the trial court erred in granting the summary judgment before us now.

C.R.C.P. 56 contemplates that opposing parties will be provided an opportunity to respond to authority cited in support of or in opposition to a motion for summary judgment. *People in Interest of A.E.*, 914 P.2d 534 (Colo.App.1996). C.R.C.P. 16 provides that a trial court should enter a trial management order before the actual trial, listing deadlines for filing pretrial motions and requiring the parties to file motions at least fourteen days before trial.

■ An issue not raised by the moving party in the motion or brief cannot serve as the basis for summary judgment because the nonmoving party is not put on notice of the need to present evidence concerning that issue. *See Jefferson County School District R–1 v. Justus*, 725 P.2d 767 (Colo.1986); *Wallman v. Kelley*, 976 P.2d 330 (Colo.App. 1998).

■ Interpretation of a written contract is a question of law for the court. *B & B Livery, Inc. v. Riehl*, 960 P.2d 134 (Colo. 1998). Similarly, whether a contract is ambiguous is a question of law and is reviewed *de novo*. *Branscum v. American Community Mutual Insurance Co.*, 984 P.2d 675 (Colo. App.1999). A contract term is ambiguous if it is reasonably susceptible to more than one meaning, but the potential for more than one interpretation does not, in itself, create ambiguity. *Allstate Insurance Co. v. Juniel*, 931 P.2d 511 (Colo.App.1996).

■ To ascertain whether an agreement is ambiguous, the agreement's language should be construed with the plain and generally accepted meaning of the words employed. *USI Properties East, Inc. v. Simpson,* 938 P.2d 168 (Colo.1997). Contracts should be interpreted to effectuate the intent of the parties and the purpose of the contract. *Branscum v. American Community Mutual Insurance Co., supra.*

■ The intent of the parties should be determined from the language of the contract itself, *Humphrey v. O'Connor,* 940 P.2d 1015 (Colo.App.1996), and extrinsic evidence of intent is not admissible until the contract has been found to be ambiguous. *In re Marriage of Thomason,* 802 P.2d 1189 (Colo.App. 1990).

■ Here, it is unclear whether, during the hearing on Mobil's motion *in limine,* the trial court admitted or considered exhibits or any other evidence even though counsel offered exhibits without objection. This uncertainty is reflected in the royalty owners' later motion seeking the trial court's clarification whether it had considered any exhibits or other evidence in making its ruling.

In addition, on the morning of trial, the court transformed the motion *in limine* hearing into a hearing for summary judgment although none of the parties had moved for summary judgment on remand. While certain circumstances may justify such a procedure—for example, where there clearly are undisputed facts—in this case the panel in the prior appeal reversed the prior summary judgment, after concluding there were unresolved issues of fact regarding whether all the elements of collateral estoppel were met, especially the issue of privity.

Given these circumstances, we conclude that the trial court's decision to grant summary judgment, without notice to the parties and a reasonable opportunity for them to argue the disputed issues of fact and to submit affidavits and other evidence, resulted in prejudice to the royalty owners. *Cf. Benson v. Colorado Compensation Insurance Authority,* 870 P.2d 624 (Colo.App.1994)(rejecting party's argument that it lacked a meaningful opportunity to respond to opposing party's motion for summary judgment, where nonprevailing party was permitted to present argument at reconsideration hearing and also failed to show prejudice). Hence, the summary judgment cannot stand.

■ Contrary to Mobil's contention, we further conclude the factual determination of the privity issue should be made by the court, not by the jury. *See Lowell Staats Mining Co. v. Philadelphia Electric Co.,* 878 F.2d 1271 (10th Cir.1989)(determination of identity between litigants for the purpose of establishing privity is a factual question for the trial court); *People v. Tynan,* 701 P.2d 80 (Colo.App.1984)(identity of parties or their privies for *res judicata* purposes was a factual determination made by the trial court).

On remand, the trial court should conduct a hearing on the privity issue and allow the parties a reasonable opportunity to present evidence in accordance with C.R.C.P. 56.

### IV. Collateral Estoppel

Because they will arise on remand, we next address the arguments of the royalty owners and Mobil—based on different theories—that the trial court erred in determining the applicability of collateral estoppel to this proceeding. Both sides claim some benefit from the Wyoming federal district court's ruling based on collateral estoppel.

The royalty owners contend that Mobil is bound by the Wyoming federal district court's conclusion that § 5.11 of the Unit Operating Agreement is ambiguous, and that under the doctrine of collateral estoppel, Mobil was precluded from taking an inconsistent position in this case. Mobil contends that it was entitled to assert the defense of collateral estoppel against the royalty owners and that the trial court erred in ruling otherwise.

### A. Offensive Collateral Estoppel

■ Initially, we note that the royalty owners raised the issue of offensive nonmutual collateral estoppel in the trial court and again in this appeal. However, they did not raise it in the trial court until after the court had ruled collateral estoppel was inapplicable. Nevertheless, because the issue will arise on remand, we address whether offensive

nonmutual collateral estoppel applies and precludes Mobil from relitigating any issue that was decided by the Wyoming federal district court. We conclude that it does.

■ Collateral estoppel (or issue preclusion) precludes the relitigation of an issue if: (1) the issue precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) the party against whom estoppel is sought was a party to or was in privity with a party to the prior proceeding; (3) there was a final judgment on the merits in the prior proceeding; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. *Michaelson v. Michaelson,* 884 P.2d 695 (Colo.1994).

■ Offensive nonmutual collateral estoppel occurs when a plaintiff seeks to preclude a defendant from relitigating an issue that the defendant previously litigated unsuccessfully in another action against another party. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

In *Central Bank Denver, N.A. v. Mehaffy, Rider, Windholz & Wilson,* 940 P.2d 1097, 1103 (Colo.App.1997), a panel of this court explained that application of that type of estoppel is discretionary:

> When the doctrine of collateral estoppel was expanded to include offensive collateral estoppel, its application was made discretionary with the trial court because it does not promote judicial economy in the same way as defensive nonmutual collateral estoppel and because it often will be unfair to defendants.

Mobil concedes that three of the four requirements of issue preclusion have been met, and we agree. First, the Wyoming federal district court examined the same Agreements that are in dispute here and concluded that § 5.11 of the Unit Operating Agreement was ambiguous. Hence, one issue that was actually litigated in the prior proceeding is identical to an issue in this case. Second, Mobil is a party in this action and was a party in the Wyoming action. Also, there was a final judgment on the merits in that prior proceeding.

The only element of collateral estoppel in dispute is whether Mobil had a full and fair opportunity to litigate the issue of § 5.11's ambiguity in the Wyoming litigation. Mobil contends that element has not been met, and collateral estoppel is inapplicable because it was merely a third-party defendant in the Wyoming litigation. We are not persuaded.

■ To determine whether a party has received a full and fair opportunity to litigate an issue in an earlier action, the following factors are considered: (1) whether the remedies and procedures of the first proceeding are substantially different from those in the proceeding in which collateral estoppel is asserted; (2) whether the party in privity with the party against whom collateral estoppel is sought had sufficient incentive to litigate vigorously; and (3) the extent to which the issues are identical. *Bebo Construction Co. v. Mattox & O'Brien, P.C.,* 990 P.2d 78 (Colo. 1999).

Before trial, Mobil settled with the working interest owners except for TAC. Nevertheless, Mobil was a named party to the Wyoming litigation and remained so. The record reflects that Mobil's counsel was present throughout the testimony, that its interests were in alignment with the other defendant, TAC, and that both TAC and Mobil had sufficient incentive to litigate vigorously the interpretation of the Agreements. In its brief filed in support of its motion for summary judgment, Mobil also admitted that, "as a party to TAC's third-party complaint for a declaratory judgment on the meaning of Section 5.11, Mobil is bound by the Court's ruling in the Wyoming Litigation."

We therefore conclude that the doctrine of collateral estoppel precludes Mobil from relitigating the issue of the ambiguity of § 5.11 of the Unit Operating Agreement and that the trial court erred in ruling otherwise. Accordingly, Mobil is bound by the federal court's conclusions that: (1) § 5.11 is ambiguous as a matter of law; (2) the proceeds of all natural gas sold from the unit shall be distributed *pro rata* among all the working interest owners; and (3) § 5.11 does not require that a party actually have a gas purchaser before any of its share of the "gas

available for sale" can be considered "excess gas," or before the market sharing provisions otherwise go into effect.

### B. Defensive Collateral Estoppel

■ Mobil contends in its cross-appeal the trial court erred in determining that Mobil was not entitled to assert the defense of collateral estoppel. Mobil maintains that TAC, a party in the Wyoming litigation, was in privity with the plaintiffs in this action, and the first trial court so found. We conclude further proceedings are necessary on this issue.

As noted earlier, in *Antelope I,* a panel of this court reversed the summary judgment entered by the first trial court, after concluding at least one of the elements of collateral estoppel was unsatisfied because there was a genuine issue of material fact whether the royalty owners were in privity with TAC. The prior panel then remanded for a factual determination on that issue.

On remand, the trial court responded to the collateral estoppel issue addressed by the panel in *Antelope I* by ruling that collateral estoppel did not apply. It determined that the interests of TAC and the interests of the royalty owners were not the same. The trial court thus found as a matter of law that there was no privity between them and that Mobil was not entitled to assert collateral estoppel or issue preclusion as to the royalty owners. The trial court also concluded that the issue sought to be precluded in this action was not identical to the issue actually litigated and necessarily adjudicated in the Wyoming proceeding. *See* Restatement (Second) of Judgments § 27 (1982)(when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties).

However, while the trial court found there was no privity, we are unable to determine the evidentiary basis for its finding. We therefore conclude the factual issue of privity must be reconsidered on remand. Again, contrary to Mobil's contention, the factual determination of the privity issue in this context should be made by the court, not by the jury. *See Lowell Staats Mining Co. v. Philadelphia Electric Co., supra.*

Accordingly, on remand, the trial court should resolve the issue whether there was privity between TAC and plaintiffs, and whether Mobil is entitled to assert the defense of collateral estoppel against the royalty owners.

### V. Remaining Issues

Because the parties raise several additional contentions that will arise on remand, we address them here.

### A. Royalty Owners Bound by Unit Operating Agreement

■ The royalty owners contend § 10.8.1 of the Unit Agreement is ambiguous because it refers to § 5 of the Unit Operating Agreement, which applies only to "parties," and the royalty owners deny they are parties to that agreement. We disagree.

Not only does the lease bind the royalty owners and Mobil, but in November 1982, the royalty owners' representative signed a Ratification Agreement to the Unit Agreement. The Ratification Agreement acknowledges that the royalty owners received "full and true copies" of the Unit Agreement and the Unit Operating Agreement. Although the Ratification Agreement does not expressly adopt the Unit Operating Agreement, ratification is unnecessary under the express terms of § 7 of the lease.

We thus reject the royalty owners' contention that they are not parties to the Unit Operating Agreement and are not bound by its terms.

### B. § 5.11 of Unit Operating Agreement Governs

■ The royalty owners next contend the trial court erred in determining that § 5.11 of the Unit Operating Agreement applies to them. According to the royalty owners, § 10.8.1 of the Unit Agreement governs the payments of royalties to royalty owners, whereas Section 5 of the Unit Operating Agreement governs the allocation of gas among working interest owners. Alterna-

tively, the royalty owners contend that even if section 5 applies, the trial court should have applied § 5.9 instead of § 5.11, and that the trial court on remand did not properly consider their argument regarding the applicability of § 5.9. We disagree.

Following the remand from the first appeal, the trial court determined that § 10.8.1 of the Unit Agreement ambiguously references article 5 of the Unit Operating Agreement, and that the applicable portion was § 5.11. Contrary to the contention of the royalty owners, the meaning of § 10.8.1's reference to Article 5 was an issue that was properly resolved by the trial court rather than the jury.

Section 5.9 is entitled "taking in Kind," and provides:

> Each Party shall currently, as produced, take in kind or separately dispose of its share of Allocable Unitized Substances .... Except as otherwise provided in Section 5.10 or 5.11, each Party shall be entitled to receive directly all proceeds from the sale of its share of Unitized Substances sold.

In concluding that § 10.8.1 referred to § 5.11 of the Unit Operating Agreement, the trial court reasoned that:

> Section 10-8-1 also goes on to state that each such owner shall take in kind or separately dispose of his share, skipping some language, in accordance with Article 5 of the [Unit] Operating Agreement.
>
> And the question is, what is the share as used in 10.8.1? Since 10.8.1 specifically ... states, "in accordance with Article 5 of the Operating Agreement," it's clear from the language of the Unit Agreement that in determining what is Mobil's share, that reference needs to be made to Article 5 of the [Unit] Operating Agreement.
>
> [S]ection 5.11 of the [Unit] Operating Agreement states that excess gas which is reinjected will be deemed to be the gas of all parties such that all parties will share ratably in a deferral of sales or loss.
>
> Therefore, it is clear from the Unit Agreement that in determining its share, it's needed to refer to section 5 of the [Unit] Operating Agreement, and it's clear from

the [Unit] Operating Agreement that [its] share under these circumstances [is] defined by 5.11.

We perceive no basis for disturbing the trial court's conclusions that: (1) the language, "in accordance with Article 5," contained in § 10.8.1 of the Unit Agreement was intended to reference § 5.11 of the Unit Operating Agreement; and (2) § 5.11 governs the payment of royalties to the royalty owners.

The trial court's conclusion that § 5.11 governs is also supported by the decision of the federal district court to the extent that the federal court, in the earlier proceedings, rejected essentially the same argument that is now being made by the royalty owners regarding the proper construction of § 5.11. In the royalty owners' reply brief filed in this appeal, they state their position regarding 5.11 as follows:

> The Royalty Owners' position, in contract, [to Mobil's position] is firmly grounded in *all* the language of Section 5.11. When the parties to the Operating Agreement (including Mobil) defined "excess gas" in terms of "gas available for sale [which] exceeds the quantity of gas *such party's gas purchaser will take*," they intended that a party must actually have a gas purchaser who will not take a portion of a party's gas before that gas becomes "excess gas." In their offer of proof in the trial court, the Royalty Owners stated that they were prepared to prove as a matter of fact that the Agreements actually require that a WIO have a gas purchaser before any of its share of the "gas available for sale" can be considered "excess gas."
>
> Thus the royalty owners contend "a trial is required to determine what the parties meant by the reference to article 5 in § 10.8.1". (original emphasis)

The Wyoming federal district court rejected the argument—made by certain of the working interest owners there and by the royalty owners here—that § 5.11 required a working interest owner to have a gas purchaser before its share of the "gas available for sale" could be considered "excess gas." To the contrary, the federal district court found in its Findings of Facts and Conclu-

**1006**

sions of Law entered on July 30, 1990, that: "[T]he evidence overwhelmingly supports the conclusion that all parties intended § 5.11 to be a market sharing provision without a gas purchaser prerequisite."

Although the Wyoming federal district court did not specifically address § 10.8.1 of the Unit Agreement, it referred to § 5.9 and § 5.11 of the Unit Operating Agreement before concluding that § 5.11 applied and governed the allocation of gas among the working interest owners.

Accordingly, we uphold the trial court's conclusion that § 10.8.1 of the Unit Agreement was intended to reference § 5.11 of the Unit Operating Agreement, and that § 5.11 governs the payment of royalties to the royalty owners.

### C. § 13.1.2 of the Unit Agreement

Mobil next asserts that § 13.1.2 of the Unit Agreement, which addresses royalty payments, requires the same result reached by the trial court on remand. However, this issue was not addressed by the trial court, and we do not address it here. It may be considered on remand.

### VI. Conclusion

The summary judgment entered in favor of Mobil is reversed, as are the orders determining that the royalty owners and Mobil were not entitled to assert the defense of collateral estoppel, and the cause is remanded for further proceedings. The trial court shall conduct such further proceedings as are consistent with the views expressed in this opinion, including our holdings that: (1) the royalty owners are parties to the Unit Operating Agreement and are bound by its terms; (2) § 10.8.1 of the Unit Agreement was intended to reference § 5.11 of the Unit Operating Agreement; and (3) § 5.11 governs the payment of royalties to the royalty owners.

On remand, Mobil may not relitigate whether § 5.11 of the Unit Operating Agreement is ambiguous, but is bound by the federal court's conclusions, as outlined in section IV of this opinion.

* Taubman, J., would GRANT.

On remand, the trial court also should conduct a hearing and determine whether privity exists between TAC and the royalty owners. It if so finds, the court should permit Mobil to assert the defense of collateral estoppel against the royalty owners Mobil also may assert on remand that it is entitled to summary judgment based on § 13.1.2 of the Unit Agreement.

TAUBMAN and ROY, JJ., concur.